UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



TRICOU BRABHAM,
Individually and as Personal Representative of the
Estate of DANIEL E. BRABHAM

              Plaintiff,

        v.

THE NATIONAL FOOTBALL LEAGUE,
NFL PROPERTIES, LLC,

              Defendants.

No. _____

12 CV 9249

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, for the reasons set forth below, Defendants National Football League ("NFL") and NFL Properties LLC ("NFLP," and together with the NFL, the "NFL Defendants"), by their undersigned attorneys, file this Notice of Removal to remove the claims against them in this action from the Supreme Court of the State of New York, County of New York, in which the above-captioned case is now pending, to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1367, 1441 and 1446. Removal is made pursuant to 28 U.S.C. § 1331 on the basis of federal question jurisdiction. The grounds for removal are as follows:

## II.    INTRODUCTION AND BACKGROUND

1.    On November 20, 2012, the NFL Defendants were served by plaintiff, Tricou Brabham, individually and as personal representative of the Estate of Daniel E. Brabham, a former professional football player, with a Complaint (the "Complaint") filed in the Supreme Court of the State of New York, County of New York,

No. 158011/2012. Copies of the Complaint and other documents filed in this action are annexed as Exhibit A.

2.       The Complaint alleges that decedent Daniel Brabham played in the American Football League ("AFL") from 1963-1968 and, prior to his death, purportedly suffered from "severe memory loss, cognitive decline, dementia, and, on information and belief, chronic traumatic encephalopathy ('CTE')," which was allegedly caused by "multiple repetitive traumatic head impacts and concussions" sustained during his professional football playing career. (Compl. ¶¶ 30-31.) The Complaint further alleges, among other things, that the NFL Defendants (with the NFL as the successor of the AFL) "fail[ed] to disclose the true risks of repetitive sub-concussive and concussive impacts to NFL players," were "aware of how to protect NFL players from dangerous circumstances on the field of play and took unilateral, but insufficient, measures to do so," "fail[ed] to provide [decedent] with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arise from repetitive head impacts during NFL games and practices," and "misrepresented . . . that there is no link (or an insufficient scientific link) between sub-concussive and/or concussive head impacts in NFL games and practices and later-in-life cognitive/brain injury[.]" (Compl. ¶¶ 22, 95, 97, 248.) The Complaint purports to allege causes of action for declaratory relief, fraudulent concealment, fraud, negligent misrepresentation, negligence, negligent hiring, negligent retention, civil conspiracy/fraudulent concealment, loss of consortium, and wrongful death. (Compl. ¶¶ 241-344.) Plaintiff seeks declaratory relief, compensatory and punitive damages, prejudgment interest, costs and attorneys' fees, and "such other and further relief as may be appropriate." (Compl. pp. 69-70.)

3.     The relationship between the NFL Defendants and Daniel Brabham was governed, for certain periods of time, by the American Football League ("AFL") collective bargaining agreement (the "1968 AFL CBA"), the accompanying Constitution and By-Laws for Major Professional Football Operations as Conducted by the NFL and AFL (the "1968 Joint Constitution"), that was executed and operative during a portion of his career, specifically, the 1968 season, and the Standard Player Contract. (*See* Compl. ¶ 30.) The 1968 AFL CBA was the product of exhaustive arm's-length negotiations between the AFL and the AFL Players Association (which contracted for and on behalf of all of the AFL players and individuals who may become such players during the term of the 1968 AFL CBA), and "represents a full and complete understanding on all bargainable subjects covering players during the term of this Agreement, except for such matters as are expressly excluded from the terms of this Agreement." (1968 AFL CBA ¶ 16.) The 1968 AFL CBA, the 1968 Joint Constitution and the Standard Player Contract include, among other terms, provisions relating to player medical care and safety, rule-making, and dispute resolution.

## III.     GROUNDS FOR REMOVAL

4.     This Court has original jurisdiction of this action under 28 U.S.C. § 1331 because the action is one that is founded on a claim or right "arising under the Constitution, laws, or treaties of the United States." A defendant may remove an action to federal court under 28 U.S.C. § 1441 if the complaint presents a federal question, such as a federal claim. *See Avco Corp.* v. *Aero Lodge No. 735*, 390 U.S. 557, 560 (1968).

5.     Federal question jurisdiction exists in this case based on complete preemption under section 301 of the Labor Management Relations Act ("LMRA") of plaintiff's claims. *See Vera* v. *Saks & Co.*, 335 F.3d 109, 114 (2d Cir. 2003) ("Thus,

even though the parties agree that plaintiff's well-pleaded complaint alleges on its face only state claims . . . if plaintiff's state claims are preempted by section 301, federal jurisdiction exists and the removal of his case was proper.") (internal quotation omitted).

6.    To the extent that any claim in the Complaint is not preempted, it "form[s] part of the same case or controversy." 28 U.S.C. § 1367(a). This Court thus has supplemental jurisdiction over all parties and claims. *See Duerson* v. *Nat'l Football League*, No. 12 C 2513, 2012 WL 1658353, at *6 (N.D. Ill. May 11, 2012) ("Federal jurisdiction thus exists over [plaintiff's negligence] claim, and the court can exercise supplemental jurisdiction over the rest of Duerson's claims."); *Maxwell* v. *Nat'l Football League*, No. 11-cv-08394 R(MANx), Order at 2 (C.D. Cal. Dec. 8, 2011) ("As long as at least one federal claim is present, this Court can exercise supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367"); *Fenn* v. *Verizon Commc'ns, Inc.*, No. 08 Civ. 2348, 2010 WL 908918, at *7 n.5 (S.D.N.Y. Mar. 15, 2010) (exercising supplemental jurisdiction over claims because "[u]nder 28 U.S.C. § 1367(a), district courts have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.") (internal quotation omitted).

7.    Section 301 of the LMRA provides that the federal courts have original jurisdiction over all "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). The Supreme Court has held that "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to

uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 211 (1985); *see also Vera*, 335 F.3d at 114 (same); *Dougherty* v. *Am. Tel & Tel. Co.*, 902 F.2d 201, 204 (2d Cir. 1990) (holding that plaintiff's fraud and negligent misrepresentation claims were completely preempted and properly removed because "obligations [to provide accurate information to plaintiffs] are inextricably intertwined with the collective agreement governing plaintiffs' employment relationship"). Thus, section 301 preempts tort claims seeking to vindicate "state-law rights and obligations that do not exist independently of [collective bargaining] agreements," as well as claims that are "substantially dependent upon analysis of the terms of [a collective-bargaining] agreement." *Allis-Chalmers*, 471 U.S. at 213, 220; *Vera*, 335 F.3d at 114 (same); *Dougherty*, 902 F.2d at 203-04 (same).

8.    Here, plaintiff's claims are preempted because resolution of those claims are "inextricably intertwined with consideration of the terms of [the CBA]" or "substantially dependent" on an analysis of the relevant provisions of the CBA. *Allis-Chalmers*, 471 U.S. at 213, 215, 220; *see also Dougherty*, 902 F.2d at 204 ("Such obligations, however, are inextricably intertwined with the collective agreement governing plaintiffs' employment relationship."); *Duerson*, 2012 WL 1658353, at *6 (concussion-related negligence claim against NFL preempted); *Maxwell*, Order at 2 (same); *Pear* v. *Nat'l Football League*, No. 11-cv-08395 R(MANx), Order at 2 (C.D. Cal. Dec. 8, 2011) (same); *Barnes* v. *Nat'l Football League*, No. 11-cv-08395 R(MANx), Order at 2 (C.D. Cal. Dec. 8, 2011) (same); *Stringer* v. *Nat'l Football League*, 474 F. Supp. 2d 894, 909-10 (S.D. Ohio 2007) (wrongful death claim arising out of heat-related

illness against the NFL preempted because resolution of the claim was substantially dependent upon an analysis of CBA provisions related to NFL player medical care and treatment).

9.    For example, adjudicating plaintiff's claims will hinge on provisions of the 1968 AFL CBA relating to player medical care. *See* 1968 Joint Constitution, Art. XIX, § 19.5 (1968) (requiring that the home team provide a doctor and ambulance for each game);[1] Standard Player Contract ¶ 15 (requiring member clubs to provide medical care as deemed necessary by their physicians in the event a player is injured);[2] *see also* 1968 AFL CBA ¶ 13 (setting forth grievance procedures for settling contract disputes); *cf.* AFL Constitution Art. A-X, § A-10.8 ("The home team shall provide ambulance facilities for the use of both teams.").

10.    Indeed, two separate district courts considering allegations similar to those alleged here have recently determined that the NFL properly removed complaints brought by former NFL players because resolution of their concussion-related negligence claims was substantially dependent on, and inextricably intertwined with, an analysis of CBA provisions concerning medical care and treatment of NFL players.  In *Duerson*, faced with a negligence claim alleging in part that the NFL "fail[ed] to educate players

---

[1]    *See Clarett* v. *Nat'l Football League*, 369 F.3d 124, 142 (2d Cir. 2004) ("In the [CBA], the union agreed to waive any challenge to the Constitution and Bylaws and thereby acquiesced in the continuing operation of the . . . rules contained therein[.]"); *see also Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 386 (S.D.N.Y. 2002) ("[The NFL Constitution and Bylaws were] bargained over and included within the scope of the CBA.").

[2]    *See Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1177 (N.D.N.Y. 1990) ("The standard player agreement, which is used for every NFL player as required by Article XII, section 1 of the [1982] CBA, is effectively incorporated by reference in that article.")

about the risks of concussions and the dangers of continuing to play after suffering head trauma," and "fail[ed] to implement policies and procedures to prevent David Duerson from returning to play with his injuries," the court held that the claim was preempted because resolution of the claim would require a court to interpret several of the CBA provisions concerning player health and safety. 2012 WL 1658353, at *1, 4. The court reasoned that:

> "A court could plausibly interpret those provisions to impose a duty on the NFL's clubs to monitor a player's health and fitness to continue to play football . . . . The NFL could then reasonably exercise a lower standard of care in that area itself. Determining the meaning of the CBA provisions is thus necessary to resolve Duerson's negligence claim."

*Id.* at *4; *see also Maxwell*, Order at 1-2; *Pear*, Order at 1-2; *Barnes*, Order at 1-2 (holding that plaintiffs' concussion-related negligence claims, premised in part on allegations that the NFL failed "to ensure accurate diagnosis and recording of concussive brain injury so the condition can be treated in an adequate and timely manner," were preempted because "[t]he physician provisions of the CBA must be taken into account in determining the degree of care owed by the NFL and how it relates to the NFL's alleged failure to establish guidelines or policies to protect the mental health and safety of its players."); *Stringer*, 474 F. Supp. 2d at 909-10 (wrongful death claim brought by decedent's widow against the NFL based on, among other things, the NFL's alleged failure to regulate adequately practices, games, equipment, and medical care to minimize the risk of heat-related illness, was preempted because resolution of the claim was "inextricably intertwined and substantially dependent upon an analysis of certain CBA provisions imposing duties on the clubs with respect to medical care and treatment of NFL players"). Having determined that at least one federal claim was present, the

*Duerson* court exercised supplemental jurisdiction over the remaining claims, and denied the motion to remand. *Duerson*, 2012 WL 1658353, at *6; *see also Maxwell*, Order at 2; *Pear*, Order at 2; *Barnes*, Order at 2.

        11.    Although the relevant provisions in the 1968 Joint Constitution and Standard Player Contract differ from the provisions on player health and safety in the CBAs analyzed by the *Duerson*, *Maxwell/Pear/Barnes*, and *Stringer* courts, their substance is the same: the 1968 Joint Constitution and the Standard Player Contract, like the later CBAs, place on the member clubs the responsibility to provide medical care to NFL players. *See* 1968 Joint Constitution, Art. XIX, § 19.5 (requiring that the home team provide a doctor and ambulance for each game); Standard Player Contract ¶ 15 (requiring member clubs to provide medical care as deemed necessary by their physicians in the event a player is injured); *cf.* AFL Constitution Art. A-X, § A-10.8 ("The home team shall provide ambulance facilities for the use of both teams."). Thus, in resolving plaintiff's claims, the court will need to interpret these provisions to determine the scope of the NFL's alleged duty to Daniel Brabham and whether the NFL acted reasonably. This is so notwithstanding that Brabham played part of his professional football career before the 1968 AFL CBA was signed, because the 1968 AFL CBA was "in effect during at least some of the events alleged in the complaint." *See Duerson*, 2012 WL 1658353, at *3 ("[I]t would be exceedingly implausible to contend that [Duerson's alleged injury] was caused only by trauma suffered from 1987 through early 1993, and not by trauma from 1983 to 1986 or later in 1993. Any attempt to exclude head trauma suffered on certain dates from the claim would thus likely fail.").

12.     The result is no different with respect to plaintiff's "post-retirement" claims, which allege in part that the NFL purportedly concealed risks to which Daniel Brabham "had been exposed on the playing field[,] delay[ing] his ability . . . to seek appropriate treatment of his latent neurodegenerative conditions," and purportedly "caus[ing] Daniel E. Brabham to ignore the need for necessary treatment." (Compl. ¶¶ 288, 304; *see also* ¶ 254.)   Resolution of these claims will substantially depend on an interpretation of the terms of NFL CBAs in effect following Daniel Brabham's retirement from professional football.   Where, as here, the union and employer negotiate benefits for retirees, retirees can proceed under section 301 to enforce a provision in the collective bargaining agreement to provide them with retirement benefits. *See Allied Chem. & Alkali Workers of Am., Local Union No. 1* v. *Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20 (1971); *see also Schweizer Aircraft Corp.* v. *Local 1752, Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 29 F.3d 83, 87 (2d Cir. 1994) (recognizing that retirees could bring an action under section 301).   Correspondingly, claims will be preempted if the court will be required to interpret or apply the CBA to resolve the retiree's claims.   *Atwater* v. *Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1185 (11th Cir. 2010).   That is precisely the case here, because certain of plaintiff's claims hinge on a duty to disclose, and the assessment of any such duty on the part of the NFL requires an interpretation of the CBAs' numerous post-retirement benefits provisions, which were negotiated by the Union and the NFL. These benefits cover a wide range of subjects, including medical care and compensation for such medical care for eligible retirees, including, for example, in the case of dementia. (*See, e.g.*, NFL 2006 CBA Art. XLVIII-D § 1 ("The parties agree to . . . establish a . . .

plan . . . to provide medical benefits to former Players who are . . . determined . . . to have dementia."); *see also* 1970 NFL CBA Art. VI § 2(c)(2); 1977 NFL CBA Art. XXXI § 8(d); 1982 NFL CBA Art. XXXIV § 8(b); 1993 NFL CBA Art. XLVII § 4(C), Art. LI.) Among other things, these provisions place responsibility on the players themselves for seeking medical care during retirement, while the NFL is tasked solely with paying the costs of certain such care for eligible retirees. (*See* 1993 NFL CBA Art. XLVII § 4(C).) Thus, to resolve plaintiff's claims, a court first must interpret these provisions to determine whether the NFL had any duty to disclose, and, if so, the scope of that duty, and whether, as plaintiff alleges, Daniel Brabham "in fact did reasonably rely" on information provided by the NFL after his professional football career. (Compl. ¶ 255.) *See Atwater*, 626 F.3d at 1183 (former players' negligent misrepresentation claim—that the NFL provided inaccurate background information regarding investment advisors for the players—was preempted because "whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations is substantially dependent on the CBA's language," which placed responsibility for player finances on players themselves).

13.     Plaintiff's claims also are preempted by section 301 because the purported duties plaintiff alleges the NFL Defendants had and breached were created, for at least a portion of Daniel Brabham's career, by the 1968 AFL CBA and are not based on an independent duty "owed to every person in society." *See United Steelworkers of Am.* v. *Rawson*, 495 U.S. 362, 370-71 (1990) (holding in the context of a labor dispute involving unionized employees that, absent an independent duty running from defendants "to every person in society," any such duty to plaintiffs must arise out of the CBA); *see also Brown* v. *Nat'l Football League*, 219 F. Supp. 2d 372, 380 (S.D.N.Y. 2002) ("To be

independent of the CBA, a tort claim must allege a violation of a duty 'owed to every person in society' as opposed to a duty owed only to employees covered by the collective bargaining agreement" (quoting *Rawson*, 495 U.S. at 371)); *Sherwin* v. *Indianapolis Colts, Inc.*, 752 F. Supp. 1172, 1178 (N.D.N.Y. 1990) (finding fraud claim arose under CBA because "[t]he Colts owed a duty to . . . provide truthful information regarding medical treatment . . . only to their players covered by the standard player agreement and the CBA," not "to every person in society" (quoting *Rawson*, 495 U.S. at 371)). Plaintiff's claims hinge fundamentally on the NFL's purported failure to implement adequate rules, regulations, and guidelines regarding player health and safety. (*See, e.g.,* Compl. ¶ 9.) The 1968 AFL CBA and Joint Constitution, however, establish the duty of the League and its Clubs to implement and enforce rules regarding professional football. *See* 1968 Joint Constitution, Art. XI, § 11.2 (1968) (delegating to the NFL and AFL, and their Clubs, the obligation to "amend[] or change[]" all "[p]laying rules," and further requiring that all proposed rule changes be presented to the NFL and AFL prior to a vote).

## IV.    REMOVAL IS PROCEDURALLY PROPER

14.    The Southern District of New York is the federal district in which the Supreme Court of the State of New York, County of New York—where plaintiff filed her Complaint—is located.

15.    This Notice of Removal is timely under 28 U.S.C. § 1446(b), which states that "notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based."

16.     Written notice of the filing of this Notice of Removal will be provided to plaintiff, and a copy of this Notice will be filed in the appropriate state court, as required by 28 U.S.C. § 1446(d).  This Notice of Removal is signed pursuant to Fed. R. Civ. Proc. 11.  *See* 28 U.S.C. § 1446(a).

17.     In filing this Notice of Removal, the NFL Defendants do not waive any defenses that may be available, including without limitation jurisdiction, venue, standing, or procedures for the disposition of this action in accordance with the terms of the CBA.  Nor do the NFL Defendants admit any of the factual allegations in the Complaint; rather, the NFL Defendants expressly reserve the right to contest those allegations at the appropriate time.

WHEREFORE, the NFL Defendants remove the above-captioned action brought against them in the Supreme Court of the State of New York, County of New York.

Dated:  New York, New York
         December 19, 2012

                    Respectfully submitted,

                    PAUL, WEISS, RIFKIND, WHARTON &
                    GARRISON LLP

                    Brad S. Karp (bkarp@paulweiss.com)
                    Theodore V. Wells, Jr. (twells@paulweiss.com)
                    Beth A. Wilkinson (bwilkinson@paulweiss.com)
                    Lynn B. Bayard (lbayard@paulweiss.com)

                    1285 Avenue of the Americas
                    New York, NY  10019-6064
                    (212) 373-3000

                    *Attorneys for the NFL Defendants*

# EXHIBIT A

Case 2:12-cv-09849-KBF Document 1-15 Filed 02/19/13 Page 15 of 93 INDEX NO. 158011/2012

| | |
|---|---|
| SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK | Index No.: |
| | Date Filed: |
| TRICOU BRABHAM, Individually and as Personal Representative of the Estate of DANIEL E. BRABHAM, | **SUMMONS AND VERIFIED COMPLAINT** |
| Plaintiff, | Plaintiff designates New York County as place of trial. |
| - against – | The basis of venue is defendants' place of business. |
| THE NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES, LLC, | Plaintiff resides in Prairieville, LA |
| Defendants. | Plaintiff demands trial by jury |

To the Above-Named Defendants:

**YOU ARE HEREBY SUMMONED**, to answer this Complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons to serve a Notice of Appearance, on the Plaintiff's Attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
      November 14, 2012

Gene Locks, Esq.
Marc P. Weingarten, Esq.
Andrew P. Bell, Esq.
LOCKS LAW FIRM PLLC
747 Third Avenue, 37th Floor
New York, NY 10017
Tel: (212) 838-3333
Fax: (212) 838-3735
www.lockslaw.com

To: See Attached Service Rider

## SERVICE RIDER

*Tricou Brabham, Individually and as Personal Representative of the Estate of*
*Daniel E. Brabhamv. The National Football League, NFL Properties, LLC*
*Supreme Court of the State of New York, New York County*

## DEFENDANTS

National Football League
345 Park Avenue
New York, New York 10017-1216

NFL Properties, LLC
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| TRICOU BRABHAM,<br>Individually and as Personal Representative of the<br>Estate of DANIEL E. BRABHAM,<br><br>        Plaintiff,<br><br>  - against –<br><br>THE NATIONAL FOOTBALL LEAGUE and<br>NFL PROPERTIES, LLC,<br><br>        Defendants. | Index No.:<br>Date Filed:<br><br>**VERIFIED COMPLAINT**<br><br>Plaintiff designates New York County<br>as place of trial.<br><br>The basis of venue is defendants' place<br>of business.<br><br>Plaintiff resides in Prairieville, LA<br><br>Plaintiff demands trial by jury |

## TABLE OF CONTENTS

PAGE

INTRODUCTION ............................................................................................................ 1

JURISDICTION AND VENUE ...................................................................................... 7

PARTIES ........................................................................................................................ 7

GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS
AGAINST THE NFL DEFENDANTS ........................................................................... 9

    The NFL's Influence ............................................................................................. 10

    The NFL Has Mythologized Violence Through the Media ................................. 10

    The NFL Markets and Glorifies Football's Violence Through
    NFL Films ............................................................................................................. 11

    Head Injuries, Concussions, and Neurological Damage .................................... 14

    The NFL Was and Is in a Superior Position of Knowledge and
    Authority and Owed a Duty to Players ............................................................... 17

    The NFL Knew the Dangers and Risks Associated With
    Repetitive Head Impacts and Concussions ........................................................ 24

    The NFL Voluntarily Undertook the Responsibility of Studying
    Head Impacts in Football, Yet Fraudulently Concealed Their
    Long-Term Effects .............................................................................................. 32

    The Congressional Inquiry and The NFL's Acknowledgement
    of the Concussion Crisis ..................................................................................... 44

    The NFL's New Committee ................................................................................. 49

COUNT I:  ACTION FOR DECLARATORY RELIEF – LIABILITY
(Against the NFL) .......................................................................................................... 50

COUNT II:  FRAUDULENT CONCEALMENT
(Against the NFL) .......................................................................................................... 51

COUNT III: FRAUD
(Against the NFL) .......................................................................................................... 54

COUNT IV: NEGLIGENT MISREPRESENTATION
(Against the NFL)..................................................................................................56

COUNT V: NEGLIGENCE
(Against the NFL)..................................................................................................59

COUNT VI: NEGLIGENT HIRING
(Against the NFL)..................................................................................................64

COUNT VII: NEGLIGENT RETENTION
(Against the NFL)..................................................................................................65

COUNT VIII: CIVIL CONSPIRACY/FRAUDULENT CONCEALMENT
(Against All Defendants)........................................................................................67

COUNT IX: LOSS OF CONSORTIUM
(Against the NFL)..................................................................................................68

COUNT X: WRONGFUL DEATH AND SURVIVAL.........................................................69
(Against the NFL)

PRAYER FOR RELIEF ...........................................................................................................70

JURY DEMAND ......................................................................................................................70

The Plaintiff, Tricou Brabham, individually and as personal representative of the Estate of Daniel E. Brabham, deceased, by and through undersigned counsel, for her Verified Complaint against the Defendants, the National Football League ("NFL") and NFL Properties LLC ("NFL Properties") (collectively hereinafter "NFL Defendants"), allege, upon facts and information and belief, except for the allegations concerning Plaintiff's own actions, as follows.

## INTRODUCTION

1.      This case seeks a declaration of liability, injunctive relief, and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses and death suffered by the Plaintiff Tricou Brabham as personal representative of the Estate of Daniel E. Brabham, deceased and in her own right as a result of the Defendants' intentional tortious misconduct, including fraud, intentional misrepresentation, and negligence.

2.      This action arises from the pathological and debilitating effects of mild traumatic brain injuries (referenced herein as "MTBI") caused by the concussive and sub-concussive impacts that have afflicted former professional football players in the NFL.  For many decades, evidence has linked repetitive MTBI to long-term neurological problems in many sports, including football.  The NFL, as the organizer, marketer, and face of the most popular sport in the United States, in which MTBI is a regular occurrence and in which players are at risk for MTBI, was aware of the evidence and the risks associated with repetitive traumatic brain injuries virtually at the inception, but deliberately ignored and actively concealed the information from decedent Daniel E. Brabham and all others who participated in organized football at all levels.

3.      The published medical literature, as detailed later in this Complaint, contains studies of athletes dating back as far as 1928 demonstrating a scientifically observed link between repetitive blows to the head and neuro-cognitive problems.  The earliest studies focused

on boxers, but by the 1950s and 1960s, a substantial body of medical and scientific evidence had been developed specifically relating to neuro-cognitive injuries in the sport of football.

4. Since the NFL's inception in the first half of the 20th Century, the NFL has been aware of the growing body of scientific evidence and its compelling conclusions that professional football players who sustain repetitive sub-concussive and concussive impacts during their careers are at greater risk for chronic neuro-cognitive illness and disabilities both during their football careers and later in life.

5. Notwithstanding that it was aware of this body of scientific evidence, the NFL ignored, minimized, disputed, and actively suppressed broader awareness of the link between sub-concussive and concussive injuries in football and the chronic neuro-cognitive damage, illnesses, and decline suffered by former players, including Daniel E. Brabham.

6. Since its inception, the NFL has recognized, acknowledged and acted in a monopolistic manner, intent on controlling and regulating every aspect of the game of professional football, particularly with respect to player safety and health. The NFL has used this authority to compel all NFL players and participants to follow the policies, rules, and regulations the NFL has enacted and imposed. As the governing body of professional football, the NFL has held itself out as the guardian and authority on the issue of player safety and has unilaterally shouldered for itself a common law duty to provide players with rules and information that protect them as much as possible from short-term and long-term health risks.

7. The NFL's role as the guardian of player health and safety began in the 1930s, continued throughout the 1940s, 1950s and 1960s, and continues up through the present day. The NFL has exercised that role through its unilateral decisions to issue rules to improve upon NFL football's public acceptance, to make a profit, and to address issues of player safety.

During these decades, the NFL voluntarily provided teams and players with information and regulations that directly affected the short and long term health of NFL players, including Daniel E. Brabham.

8.     Despite the NFL's assumption of this responsibility, the NFL was negligent and failed to carry out this duty in that it failed to inform NFL players of the risks associated with MTBI and/or it was willfully blind to the medically proven fact that repetitive MTBI would lead to neuro-cognitive injuries in many NFL players, including Daniel E. Brabham. Further, the NFL actively suppressed and kept secret information about MTBI it knew would change the economics of the game and the health of players such as Daniel E. Brabham.

9.     The NFL, like the sport of boxing, was aware of the health risks associated with repetitive blows producing sub-concussive and concussive results and the fact that some members of the NFL player population were at significant risk of developing long-term brain damage and cognitive decline as a result. Despite its knowledge and controlling role in governing player conduct on and off the field, the NFL turned a blind eye to the risk and failed to warn and/or impose safety regulations governing this health and safety problem.

10.     While the NFL has assumed voluntarily its role as the unilateral guardian of player safety, and NFL players and their families, including Daniel E. Brabham, have looked to the NFL for guidance on player safety issues, the NFL has exacerbated the health risk to players by promoting the game's violence and lauding players for returning to play despite being rendered unconscious and/or disoriented due to their exposure to sub-concussive and concussive forces.

11.     In its supervisory role, as well as in its position as arbiter of all aspects of professional football, the NFL has, since its inception, unilaterally and voluntarily chosen how to

-3-

spend its funds to investigate and regulate many different circumstances affecting player health and safety, including, but not limited to, requiring players to wear certain equipment, designating some player gear as illegal, and ultimately deciding what helmet brand should be recognized as the official equipment of the NFL.

12.      During the decades of the 1970s and 1980s, the NFL was aware of publications in the medical science community that established that concussive and sub-concussive injuries to athletes and non-athletes were a significant risk factor for short-term and long-term neuro-cognitive health complications, both as single incidents and particularly as repetitive impacts. During these decades, the NFL voluntarily participated, albeit inadequately, in the work of various entities studying the performance and effectiveness of safety gear to reduce the risk of neurological injury.  The NFL's participation in these activities was voluntary and a continuance of the historic duty it had assumed in the first half of the twentieth century.

13.      By the early 1990s, the consensus among experts in the scientific community forced the NFL to take a different approach to the growing problem of sub-concussive and concussive injuries among existing and former NFL players.  In or around 1992, the NFL knew that many football players, including, by way of example, Al Toon, a Pro Bowl receiver for the New York Jets, had developed brain injuries, including chronic severe headaches, malaise, intolerance of loud noises, depression, and emotional lability as a consequence of multiple "dings," sub-concussive injuries, and concussions.  The NFL was aware that Mr. Toon retired in 1992 because of these chronic problems.

14.      In 1994, the NFL, through its own initiative and voluntary undertaking, took its historic duty and unilateral authority regarding player health and safety one step further.  The NFL created and/or decided to fund the NFL's so-called Mild Traumatic Brain Injury Committee

(the "MTBI Committee") ostensibly to research and study MTBI affecting NFL players. Notwithstanding this purported purpose, and despite clear medical evidence that on-field sub-concussive and concussive injuries can produce MTBI with tragic results, the NFL (a) failed to inform its current and former players of the true risks associated with MTBI and (b) purposefully misrepresented and/or concealed medical evidence on that issue.

15.     Through its MTBI Committee, the NFL gratuitously and voluntarily inserted itself into the scientific research and discussion concerning the link between sub-concussive and concussive impacts sustained by NFL players and short-term and long-term impairment of the brain. By voluntarily inserting itself into the MTBI research and public discourse, the NFL gratuitously undertook a responsibility (a) to make truthful statements; (b) not to wrongfully advance improper, biased, and falsified industry-generated studies; (c) not to discredit well-researched and credible studies that came to a conclusion that did not comport with the NFL's financial and political interests; and, (d) to inform all former players, all current players, and the football-playing public, including young people and their families, regarding the risks of MTBI in football.

16.     At the same time, the NFL and its agents continued to market, as it had in the past, the ferocity and brutality of the sport that, in part, gives rise to the latent and debilitating neuro-cognitive conditions and injuries from which Decedent Daniel E. Brabham suffered.

17.     After voluntarily assuming a duty to investigate, study, and truthfully report the medical risks associated with MTBI in football, the NFL produced industry-funded, biased, and falsified research that claimed that concussive and sub-concussive head impacts in football do not present serious, life-altering risks.

18.     For sixteen years, the NFL actively and continuously denied any link between MTBI sustained by former NFL players in NFL games and practices and the neurological symptoms and problems (such as headaches, dizziness, loss of memory, dementia and ALS) from which they now suffer. The NFL made its biased and falsified position known by way of gratuitous press releases, publications in scientific literature, and other communications.

19.     Consistent with its historic role as the guardian of player health and safety, the NFL intended for the general public, NFL players, Daniel E. Brabham, and participants at every level of the game to rely on the misinformation it propagated.

20.     During the same time period, the NFL actively sought to suppress the findings of other members of the medical communities that showed the link between on-field sub-concussive and concussive head impacts and post-career neuro-cognitive damage, illness and decline.

21.     The NFL's active and purposeful concealment and misrepresentation of the severe neurological risks of repetitive MTBI exposed players to dangers they could have avoided had the NFL provided them with truthful and accurate information. Many former NFL players, including Daniel E. Brabham, sustained repetitive sub-concussive and concussive injuries while in the NFL and now suffer from latent neurodegenerative disorders and diseases, all of which, in whole or in part, were caused by the NFL's acts and/or omissions.

22.     The NFL caused or contributed to the injuries and increased risks to Daniel E. Brabham through its acts and omissions by, among other things: (a) historically ignoring the true risks of sub-concussive and concussive injuries in NFL football; (b) failing to disclose the true risks of repetitive sub-concussive and concussive impacts to NFL players, including Daniel E. Brabham and (c) since 1994, deliberately spreading misinformation concerning the cause and

-6-

effect relationship between repetitive sub-concussive and concussive impacts in NFL football and latent neurodegenerative disorders and diseases.

23.     On information and belief, the NFL's motive to ignore and misrepresent the link between repetitive sub-concussive and concussive impacts in NFL football and latent neurodegenerative disorders and diseases was economic. The NFL knew or suspected that any rule changes that sought to recognize that link and the health risk would impose an economic cost that would significantly and adversely change the profit margins enjoyed by the NFL and its teams.

24.     On information and belief, all NFL policies and decisions relevant to the conduct alleged herein occurred primarily in the NFL corporate offices in New York.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the defendants pursuant to C.P.L.R. 301.

26.     Venue is properly in the County of New York based on C.P.L.R. 503 and 509.

## PARTIES

27.     Decedent Daniel E. Brabham was 69 years old at the time of his death on January 23, 2011. He was married to Plaintiff Tricou Brabham for thirty-nine years.

28.     Decedent attended Greensburg High School in Greensburg, Louisiana, from which he graduated in 1959.

29.     Upon graduating from Greensburg High School, Daniel E. Brabham attended the University of Arkansas, where he played varsity football.

30.     Decedent Daniel E. Brabham played linebacker for the Houston Oilers from 1963-1967 and for the Cincinnati Bengals in 1968.

31.     During the years Decedent Daniel E. Brabham played in the NFL, he sustained
(during practices and games) multiple repetitive traumatic head impacts and concussions, for
which he was never treated by a physician while he played in the NFL. Prior to his death, Daniel
E. Brabham suffered from severe memory loss, cognitive decline, dementia, and, on information
and belief, chronic traumatic encephalopathy ("CTE"), a condition caused by repetitive sub-
concussive and/or concussive blows to the head.

32.     The Defendants are in some fashion legally responsible for the injuries and
damages sustained by Decedent Daniel E. Brabham.

33.     At all times herein mentioned, Defendants, and each of them, were the agents,
servants, and employees each of the other, acting within the course and scope of said agency and
employment.

34.     Defendant NFL, which maintains its offices at 345 Park Avenue, New York, New
York, is an unincorporated association consisting of the 32 separately owned and independently-
operated professional football teams listed below. The NFL is engaged in interstate commerce in
the business of, among other things, promoting, operating, organizing, and regulating the major
professional football league in the United States. The NFL is not, and has not, been the
employer of Daniel E. Brabham, who was employed during his NFL career by the independent
clubs known as the Houston Oilers and the Cincinnati Bengals. The United States Supreme
Court held in *American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2212-13 (2010) that each team that
is a member of the NFL is a legally distinct and separate entity from both the other teams and the
NFL itself.

35.     Defendants NFL Properties, LLC is owned exclusively by the NFL and engages
in licensing and marketing of the team-owned trademarks and logos, and solicits bids from

vendors on an exclusive headwear license for National Football League, including helmets. NFL Properties, LLC was founded in 1963 and is located at 280 Park Avenue, New York, NY 10017.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

36.     The NFL generates approximately $9,300,000,000.00 in gross income per year.

37.     The NFL oversees America's most popular spectator sport, acting as a trade association for the benefit of the thirty-two independently operated Teams. The NFL's average attendance per game in 2009 was 67,509.

38.     The NFL has, since its inception in the first half of the twentieth century, governed and promoted the game of football, and as referenced in detail herein, it was created and established to act as the governing body, establishing rules related to player health and safety, League policies, and Team ownership.

39.     The NFL generates revenue mostly through marketing sponsorships, licensing merchandise, and by selling national broadcasting rights to the games. The Teams share a percentage of the League's overall revenue.

40.     The NFL earns billions of dollars from its media deals with, inter alia, ESPN ($1.1 billion), DirecTV ($1 billion), NBC ($650 million), Fox ($712.5 million), and CBS ($622.5 million).

41.     Annually, the NFL redistributes approximately $4 billion in radio, television, and digital earnings to the Teams or approximately $125 million per Team. Those revenue numbers show no sign of declining and have increased since 2009.

42.     The NFL enjoys partial monopoly power through an anti-trust exemption granted via the Federal Sports Broadcasting Act that allows the NFL to sell television rights for all 32 Teams as a single unit.

### The NFL's Influence

43.     In part because of their financial power, monopoly status, and high visibility, the NFL Defendants have had enormous influence over the game of football at all levels of the game.

44.     Over many decades, the NFL Defendants' influence has been expanded through their use of the media. Through NFL films, the NFL Network, and www.NFL.com, the NFL Defendants have promoted NFL football via every mass communication medium available.

### The NFL Has Mythologized Violence Through the Media.

45.     Part of the NFL Defendants' strategy to promote NFL football is: (a) to mythologize players and Teams; (b) to glorify the accomplishments of individuals and Teams; and (c) to glorify the brutality and ferocity of NFL football, by lauding and mythologizing the most brutal and ferocious players and collisions, and simultaneously propagating the fraudulent representation that "getting your bell rung," "being dinged", and putting big hits on others is a badge of courage and does not seriously threaten one's health.

46.     As a result of this strategy, the NFL Defendants have propagated the false myth that collisions of all kinds, including brutal and ferocious collisions, many of which lead to short-term and long-term neurological damage to current and former NFL players, are an acceptable, desired, and natural consequence of the game, and a measure of the courage and heroism of players involved at every level of the game.

47.     As a result of this strategy, and the overwhelming influence of the NFL Defendants at every level of the game, the NFL Defendants have generated for themselves and others billions of dollars every year by promoting a product of brutality and ferocity and inculcating in players at every level of the game the false and life-threatening ideas that (a)

brutal, ferocious, and debilitating collisions are a required and desired outcome in the game of football; and (b) playing despite repetitive head impacts is a laudable and desirable goal.

## The NFL Markets and Glorifies Football's Violence Through NFL Films.

48.     NFL Films is an agent and instrumentality of the NFL Defendants devoted to producing promotional films for the NFL. One television critic described NFL Films as "the greatest in-house P.R. machine in pro sports history… an outfit that could make even a tedious stalemate seem as momentous as the battle for the Alamo."

49.     NFL Films is known for the style it features in all of its productions, capturing the NFL games, plays, players, and overall NFL environment in an artistic, promotional fashion. NFL Films cinematography is intended to create compelling storylines and highlight certain aspects of the game. NFL Films takes viewers right into the game with close-ups and slow motion depiction of all the hard-hitting action on the field.

50.     NFL Films focuses on violence as one of the NFL's greatest selling points: the football player as gladiator. To advance the NFL Defendants' purpose, NFL Films has created numerous highlight features that focus solely on the hardest-hits in pro football. These featured videos are marketed and sold to advance the NFL's culture of violence as entertainment.

51.     The list of videos created by NFL Films glorifying violent plays includes, but is not limited to, the following titles: *"NFL: Moment of Impact"* (2007); *"NFL's 100 Greatest Tackles"* (1995); *"Big Blocks and King Size Hits"* (1990); *"The Best of Thunder and Destruction – NFL's Hardest Hits"*; *"NFL Films Video: Strike Force"* (1989); *"The NFL's Greatest Hits"* (1989); *"Crunch Course"*; *"Crunch Course II"* (1988); *"Crunch Masters"*; *"In the Crunch"* (1987); *"NFL Rocks"*; *"NFL Rocks: Extreme Football"* (1993).

-11-

52. NFL Films created the "*Top Ten Most Feared Tacklers*" series that was shown on the NFL Network. Now, it has its own section on the NFL's website. These features are comprised of videos highlighting the most vicious tacklers the NFL has ever seen. These videos contain numerous explicit examples of how the NFL Defendants market and glorify the violent nature of the NFL. The back cover of 2007 film "*Moment of Impact*" advertises the film as follows: "First you hear the breathing, then you feel the wind coming through your helmet's ear hole. Suddenly you're down, and you're looking through your helmet's ear hole. Pain? That's for tomorrow morning. Right now you've gotta focus – focus on the play and try not to focus on the next moment of impact."

53. The entire message deemphasizes the acute and chronic risks associated with head impacts. The 1990 film "*Big Blocks and King Size Hits*" prominently features a head-to-head collision between Minnesota Vikings' defender Jack Tatum and Oakland Raiders' receiver Sammy White in Super Bowl XI in which White's helmet is knocked clear off his head. In 1993's "*NFL Rocks*," the late Junior Seau offers his opinion on the measure of a punishing hit: "If I can feel some dizziness, I know that guy is feeling double [that]." In a segment of the same film, glorifying gutsy receivers who expose themselves to big hits by going "over the middle" of the field, former Houston Oilers receiver Ernest Givens is quoted as saying: "I get knocked out a lot, I get concussions, I get broken noses, that is part of being a receiver, that's what separates you from being a typical receiver than a great receiver." Former Dallas Cowboys receiver Michael Irvin recites a similar unawareness of the risks of concussions: "Before the game, I go to the [defensive backs] and tell them, 'Hey, you know I'll trade a concussion for a reception!'"

54.     NFL Films, therefore, advances the NFL Defendants' agenda to promote the most violent aspects of NFL football and to urge players at every level of the game to disregard the results of violent head impacts.

55.     The NFL Defendants strategically use NFL Films' cinematography and on-field microphones to exaggerate and emphasize vicious hits, which take on the appearance of the slow-motion crash test videos that appear in many car commercials, and the players taking on the role of the crash-test dummies.

56.     The NFL Defendants, through NFL Films, promote a culture in which playing hurt or with an injury is both expected and acclaimed in a mythical gladiator world.  Through NFL Films, the NFL has produced videos that praise players who embody the ethos of playing hurt (for example, "*Top Ten Gutsiest Performances*").  This film and others like it celebrate players' ability to play through the pain and injury and promote an expectation among players and fans that players must and often do play through any injury, including injuries that arise from repetitive sub-concussive and concussive blows to the head.

57.     This culture encourages NFL players to play despite a head injury.  Moreover, failure to play through such an injury creates the risk that the NFL player will lose playing time, a starting position, and possibly a career.

58.     Within this culture, the NFL Defendants purposefully profit from the violence they promote.

59.     A few examples demonstrate its indelible place in the modus operandi of the NFL Defendants.  After joining the NFL, the Cleveland Browns were led by Hall of Famer Otto Graham to many consecutive championships.  The media and the NFL management at the time

-13-

were well aware of the targeted blows to the head suffered by Graham, with resulting loss of consciousness. Nevertheless, Graham was encouraged to come back and play in each game.

60.     This attitude and League-sponsored mayhem continued in the decades of the 1980s, 1990s and 2000s, with players lauded for their "head hunting" skills. As recently as October 2010, the NFL fined some players for what it characterized as "illegal and dangerous hits", and yet the NFL Defendants sought to profit by selling photos of the illegal hits on its website for between $54.95 and $249.95.

## Head Injuries, Concussions, and Neurological Damage

61.     Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause sub-concussive and/or concussive brain injuries with a heightened risk of long term, chronic neuro-cognitive sequelae.

62.     The NFL Defendants have known or should have known for many years that the American Association of Neurological Surgeons (the "AANS") has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as:

> a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

63.     The NFL Defendants have known or should have known for many years that sub-concussive and concussive brain injuries generally occur when the head either accelerates rapidly

-14-

and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness.

64.     The NFL Defendants have known or should have known for many years that medical evidence has shown that symptoms of sub-concussive and/or concussive brain injuries can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

65.     The NFL Defendants have known or should have known for many years that once a person suffers sub-concussive and/or concussive brain injuries, he is up to four times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause brain injury, and the injured person requires more time to recover. This goes to the heart of the problem: players, such as Daniel E. Brabham, being unaware of the serious risk posed to their long-term neuro-cognitive health.

66.     The NFL Defendants have known or should have known for many years that clinical and neuro-pathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during an NFL player's career can cause severe neuro-cognitive problems such as depression and early-onset of dementia.

67.     The NFL Defendants have known or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub-concussive and concussive blows) cause ongoing and latent brain injury. These injuries have been documented and associated with sports-related head impacts in both football and boxing.

68.     The NFL Defendants have known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former

-15-

football players, including former NFL players, have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as CTE. The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above. CTE is also is associated with an increased risk of suicide.

69. The NFL Defendants have known or should have known for many years that CTE is found in athletes, including football players and boxers, with a history of repetitive head trauma. Published papers have shown that this condition is prevalent in retired professional football players who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

70. The NFL Defendants have known for many years of the reported papers and studies documenting autopsies on over twenty-five former NFL players. The papers and studies show that over ninety percent of the players suffered from CTE.

71. As a result, published peer reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing professional football are linked to significant risk for permanent brain injury.

-16-

72.     Published peer reviewed scientific studies have shown that 28% of the NFL retirees studied suffered from depression, whereas the prevalence of depression in the general population is 9.5%.

73.     Published peer reviewed scientific studies have shown that 36% of NFL retirees, age 65-75, who were studied suffered from dementia, whereas the prevalence of dementia in the general population for the same age group is merely 2.2-6.5%.

74.     Published peer reviewed scientific studies have shown that retired players with three or more reported concussions had a fivefold prevalence of mild cognitive impairment (MCI) and a threefold prevalence of significant memory problems, compared to other retirees.

75.     In a study of NFL retirees, 11.1% of all respondents reported having a diagnosis of clinical depression.

76.     NFL retirees experience earlier onset of Alzheimer's-like symptoms more frequently than the general American male population in the same age range.

77.     Repeated head trauma can also result in so-called "Second Impact Syndrome," in which re-injury to a person who has already suffered a concussion triggers swelling that the skull cannot accommodate.

**The NFL Was and Is in a Superior Position of Knowledge
and Authority and Owed a Duty to Players**

78.     At all times, the NFL's unique historical vantage point at the apex of the sport of football, paired with its unmatched resources as the most well-funded organization devoted to the business of the game, has afforded it unparalleled access to data relating the effect of head impacts on football players and made it an institutional repository of accumulated knowledge about head injuries to players.

-17-

79. The NFL's accumulated knowledge about head injuries to players, and the associated health risks therefrom, was at all times vastly superior to that available to the decedent Daniel E. Brabham, his wife Tricou Brabham, and his family.

80. From its inception, the NFL unilaterally created for itself the role of protecting players, informing players of safety concerns, and imposing unilaterally a wide variety of rules to protect players from injuries that were costly to the player, the game, and profits. From the beginning, the NFL held itself out and acted as the guardian of the players' best interests on health and safety issues.

81. For these reasons, players and their families have relied on the NFL to intervene in matters of player safety, to recognize issues of player safety, and to be truthful on the issue of player safety.

82. In a recent public admission, the NFL stated that "[s]ince its earliest days, the league has continuously taken steps to ensure that the game is played as fairly as possible without unnecessary risk to its participants, including making changes and enhancements to game safety rules." (www.nflhealthsasfety.com/commitment/regulations) (2011-2012).

83. On information and belief, since its inception, the NFL received and paid for advice from medical consultants regarding health risks associated with playing football, including the health risks associated with concussive and sub-concussive injuries. Such ongoing medical advice and knowledge placed the NFL in position of ongoing superior knowledge to the players. Combined with the NFL's unilateral and monopolistic power to set rules and determine policies throughout its game, the NFL at all relevant times was in a position to influence and dictate how the game would be played and to define the risks to which players would be exposed.

-18-

84. As a result, from its earliest years, the NFL unilaterally assumed a duty to act in the best interests of the health and safety of NFL players, to provide truthful information to NFL players regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of players.

85. The NFL's voluntary actions and authority throughout its history show that as early as the 1920s the NFL shouldered for itself the common law duty to make the game of professional football safer for the players and to keep the players, including but not limited to Daniel E. Brabham, informed of safety information they (he) needed to know.

86. The NFL's historical actions in connection with these legal duties have included, but are not limited to, the following: adding a field judge (1929); establishing hash-marks at 10 yards from the sidelines (1933); establishing the penalty of unnecessary roughness for a deliberate rough contact on the passer after the pass is made (1938); making helmets mandatory (1943); adding a back field judge (1947); establishing a rule that the ball is dead when a runner touches the ground with any part of his body except his hands while in the grasp of an opponent (1955); establishing a rule that the ball is dead immediately if the runner touches the ground with any part of his body except his hands after being contacted by a defensive player (1956); establishing a penalty for grabbing the face mask of any opponent except a runner (1956); establishing a penalty of grabbing the face mask of any opponent (1962); requiring that goal posts be offset from the goal line (1966); establishing a rule that a player who signals for a fair catch cannot block or initiate contact with one of the kicking team's players until the ball touches a player (1967); establishing a rule that a defensive player who jumps or stands on a teammate or who is picked up by a teammate cannot attempt to block an opponent's kick (1973); establishing a rule that no receiver can be blocked below the waist after moving beyond the line of

-19-

scrimmage (1974); establishing a rule that eligible receivers who take a position more than two yards from the tackle cannot be blocked below the waist (1974); establishing a rule that a defender is not permitted to run or dive into a ball carrier who has fallen to the ground untouched (1976); establishing a rule that it is illegal for a defensive lineman to strike an opponent above the shoulders during his initial charge (1977) (previously the NFL made this illegal only during the first step); establishing that it is illegal for a wide receiver to clip an opponent anywhere (1977); establishing rules as to mandatory equipment (1979); establishing that it is illegal for a player in the backfield to chop an outside rusher on a pass play (1979); establishing that it is illegal to throw a punch or forearm or to kick an opponent (1979); and establishing that it is illegal to strike, swing, or club an opponent in the head, neck or face (1980).

87.     As the sport's governing entity (with monopolistic power), the NFL has made it known to players and teams alike that the NFL actively and pervasively governs player conduct and health and safety both on and off the field. In public statements since its inception, the NFL has stated that its goals include taking necessary steps for the safety, health and well-being of players and their families.

88.     The NFL's approach has been paternalistic and has included comprehensive rookie training programs to teach new players how to manage their personal lives, inquiries from the media, and newly acquired income.

89.     For decades, the NFL voluntarily instituted programs to support player health and safety on and off the field, and the players and their families looked to the NFL for guidance on these issues.

90.     By way of example only, in 1959 (before Daniel E. Brabham entered the League), the NFL unilaterally established medical, life insurance, and retirement plans, funded

the plans, and controlled the nature and extent of each of these plans without any player involvement. The NFL made all changes to the plans unilaterally.

91.     Despite its unilateral duty and power to govern player conduct on and off the field, the NFL has for decades ignored, turned a blind eye to, and actively concealed the risks to players of repetitive sub-concussive and concussive head impacts, which can and do result in players being knocked unconscious or having "their bell rung" so that they are in a conscious but disoriented state.

92.     As one example, Cleveland Browns Quarterback Otto Graham was knocked unconscious during a game against the San Francisco 49ers in 1953 and he was carried off the field. After regaining consciousness, however, Graham returned to the field and played the balance of the game. Even now, this is a routine occurrence in NFL football games. For many former players, including Daniel E. Brabham, the result has been tragic and catastrophic.

93.     Thus, since its inception, and continuing into the present, the NFL has been in a position that affords it a special relationship to NFL players as the guardian of their health and safety. For that reason, from its inception and continuing into the present, the NFL owed a duty of reasonable care to keep NFL players, including Daniel E. Brabham, informed of neurological risks, to inform them truthfully, and not to mislead them about the risks of permanent neurological damage that can arise from repetitive sub-concussive and/or concussive blows to the head while playing NFL football.

94.     By way of example only, during the decades of the 1930s through the 1960s, the NFL – in its supervisory role as guardian of player safety -- identified  tackling techniques that exposed players to increased risks of injury, including head, neck, and leg injuries. Once

identified, the NFL issued regulations which served as daily warnings to players of the hazardous nature of continuing to follow hazardous tackling techniques.

95.     As a result of its position of authority and repository of a composite of information throughout the League, the NFL was aware of how to protect NFL players from dangerous circumstances on the field of play and took unilateral, but insufficient, measures to do so.

96.     Thus, for decades, the NFL failed to warn NFL players, including Daniel E. Brabham, of the medical risks associated with repetitive head impacts during NFL games and practices.

97.     Instead, the NFL ignored the risks and/or was willfully blind to the risks and/or actively concealed the risks from NFL players, including Daniel E. Brabham, despite its historic and proactive role as the guardian of player safety. For that reason, the NFL breached its common law duty of reasonable and ordinary care to Daniel E. Brabham by failing to provide him with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arise from repetitive head impacts during NFL games and practices.

98.     On information and belief, over the past two decades, the NFL continued to exercise this common law duty and its unilateral authority to investigate and advise NFL players on many diverse and important topics, and that should have included the recognition of circumstances that can precipitate MTBI, the long-term potential consequences of brain injury to NFL players, and solutions for players who have sustained such brain injury.

99.     Moreover, from 1994 until 2010, the NFL publicly inserted itself into the business of head injury research and openly disputed that any short-term or long-term harmful effects arose from football-related sub-concussive and concussive injuries. The NFL propagated

-22-

its own industry funded and falsified research to support its position, despite its historic role as the guardian of player safety, and despite the fact that independent medical scientists had already come to the opposite conclusion.

100.    As such, the NFL continued its existing common law duty to provide truthful scientific research and information about the risks of concussive and/or sub-concussive brain injuries to NFL players, including Daniel E. Brabham, who relied on the NFL's research and pronouncements on that subject.

101.    The NFL knew, reasonably expected, and intended NFL players, including Daniel E. Brabham, to rely on its research and pronouncements on that subject, in part, because of the historic special relationship between the NFL and the players and, in part, because the NFL knew that the vast majority of NFL players, including Daniel E. Brabham, played under non-guaranteed contracts and would willingly (and unknowingly) expose themselves to additional neurological injury and an increased risk of harm solely to maintain those non-guaranteed contracts.

102.    The NFL had, in fact, developed over time a market brand analogous to that of Roman Gladiators that urged players to sacrifice all for "the game" as an essential mentality for play in the NFL. The 2007 NFL Films video *Moment of Impact* emphasized that "3rd and 4th stringers, special team players will risk life and limb to catch the coach's eye" for a spot on an NFL roster. During a voice-over emphasizing that these players hope "to make the team by making an impact," the video depicts a Buffalo Bills defender delivering a devastating blow directly to the head of the vulnerable Indianapolis Colts' kick-return man who had just caught the ball.

### The NFL Knew the Dangers and Risks Associated with
### Repetitive Head Impacts and Concussions

103. For decades, the NFL has been aware that multiple blows to the head can lead to long-term brain injury, including but not limited to memory loss, dementia, depression, and CTE and its related symptoms.

104. In 1928, pathologist Harrison Martland described the clinical spectrum of abnormalities found in "almost 50 percent of fighters [boxers] . . . if they ke[pt] at the game long enough" (the "Martland study"). The article was published in the *Journal of the American Medical Association*. The Martland study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

105. In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

106. In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of creating mandatory rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post-bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that the boxer suffered significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

-24-

107. The recommendations were codified as rules of the New York State Athletic Commission.

108. In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathic changes in professional boxers.

109. That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.,* recommending that players cease to play football after receiving their third concussion.)

110. In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

111. A 1963 study by Drs. Mawdsley & Ferguson published in *Lancet* found that some boxers sustain chronic neurological damages as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function.

112. A 1967 study Drs. Hughes & Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in game conditions, including after head trauma.

113. In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries, recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

114. In 1973, Drs. Corsellis, Bruton, & Freeman-Browne studied the physical neurological impact of boxing. This study outlined the neuropathological characteristics of

-25-

"Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

115.    A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered two concussions took longer to recover than those who suffered from a single concussion. The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

116.    In the 1960s and 70s, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram. By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

117.    In 1973, a potentially fatal condition known as "Second Impact Syndrome"—in which re-injury to the already-concussed brain triggers swelling that the skull cannot accommodate—was identified. It did not receive this name until 1984. Upon information and belief, Second Impact Syndrome has resulted in the deaths of at least forty football players.

118.    Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function;

-26-

encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;

acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

immediate retrograde memory issues occur following concussions;

mild head injury requires recovery time without risk of subjection to further injury;

head trauma is linked to dementia;

a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

119.    In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment.  The studies were published in neurological journals and treatises within the United States.

120.    In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage.  With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

-27-

121. The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

122. In 1986, Dr. Robert Cantu of the American College of Sports Medicine published *Concussion Grading Guidelines*, which he later updated in 2001.

123. By 1991, three distinct medical professionals/entities, all independent from the NFL—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

124. On information and belief, by 1991, the NCAA football conferences and individual college teams' medical staffs, along with many lower-level football groups (*e.g.,* high school, junior high school, and pee-wee league) had disseminated information and adopted criteria to protect football players even remotely suspected of having sustained concussions.

125. Further, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states: "[b]oxers that suffered concussion by KO [loss of consciousness], should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including but not limited to KO's, and should not compete in a boxing match in less than 75 days."

126. In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

127. In 1999, former Pittsburgh Steeler and Hall of Fame inductee Mike Webster filed with the NFL a request that he receive complete disability benefits based on the fact that he had

sustained repeated and disabling head impacts while a player for the Steelers. In 1999, Webster submitted extensive medical reports and testimony that stated, among other things, that Webster suffered from "traumatic or punch drunk encephalopathy [brain disease]" sustained from playing football that left Webster totally and permanently disabled as of 1991.

128.    The NFL's own physician independently examined Webster and concluded that Webster was mentally "completely and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990."

129.    Webster died in 2002 at the age of fifty. In December 2006, the Estate of Webster received an unpublished opinion from the United States Court of Appeals for the Fourth Circuit that affirmed the decision of the District Court that the administrator had wrongly denied him benefits. In its opinion, the Fourth Circuit stated that the NFL Plan had acknowledged that the multiple head injuries Webster sustained during his playing career (1974-1990) ". . . had caused Webster eventually to suffer total and permanent mental disability . . . ."

130.    Thus, the NFL, through its own expert medical testimony and the expert testimony submitted by Webster knew and accepted that repetitive traumatic brain injuries sustained by a Hall of Fame player led to long-term encephalopathy and permanent mental disability.

131.    A 2000 study, which surveyed 1,090 former NFL players, found that more than sixty (60) percent had suffered at least one concussion, and twenty-six (26) percent had suffered three (3) or more, during their careers. Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

132.    Also in 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers, with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (3) eight suffered from Alzheimer's disease.

133.    A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990. Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%. High school football produced the greatest number of football head-related deaths. From 1984 through 1999, sixty-nine football head-related injuries resulted in permanent disability.

134.    In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

135.   This echoed similar medical protocol established at a Vienna conference in 2001. These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

136.   The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

137.   The chart on the following page, which was excerpted from an article in the 2010 *New England Journal of Medicine* entitled "Traumatic Brain Injury—Football, Warfare, and Long-Term Effects," shows that even mild "traumatic brain injury" ("TBI") can have lasting consequences that are manifest later in the football player's life.

138.   A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

139.   Indeed, while the NFL knew for decades of the harmful effects of sub-concussive and concussive injuries on a player's brain, it actively concealed these facts from coaches, players, and the public.

140.   On information and belief during every decade referenced above, the NFL was advised by physicians of all kinds regarding the risks associated with playing the game of football, including the risks associated with head impacts and MTBI.

141.   As described above, the NFL has known for decades that MTBI can and does lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

-31-

142.   Rather than take immediate measures to protect NFL players from these known dangers, between the 1950s and 1994, the NFL failed to disseminate to then-current and former NFL players relevant health information it possessed regarding the significant risks associated with MTBI.

**The NFL Voluntarily Undertook the Responsibility of Studying Head Impacts In Football,
Yet Fraudulently Concealed Their Long-Term Effects.**

143.   In 1994, then NFL commissioner Paul Tagliabue agreed to fund a committee to study the issue of head injury in the NFL. The NFL voluntarily and unilaterally formed the MTBI Committee to study the effects of concussions and sub-concussive injury on NFL players.

144.   At that time, the current NFL Commissioner, Roger Goodell, was the NFL's Vice President and Chief Operating Officer.

145.   With the MTBI Committee, the NFL voluntarily inserted itself into the private and public discussion and research on an issue that goes to the core safety risk for players who participate at every level of the game.   Through its voluntary creation of the MTBI Committee, the NFL affirmatively assumed a duty to use reasonable care in the study of concussions and post-concussion syndrome in NFL players; the study of any kind of brain trauma relevant to the sport of football; the use of information developed; and the publication of data and/or pronouncements from the MTBI Committee.

146.   Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of fraudulent and negligent conduct, which included a campaign of disinformation designed to (a) dispute accepted and valid neuroscience regarding the connection between repetitive traumatic brain injuries and concussions and degenerative brain disease such as CTE; and (b) to create a falsified body of research which the NFL could

cite as proof that truthful and accepted neuroscience on the subject was inconclusive and subject to doubt.

147.     The NFL's response to the issue of brain injuries and degenerative brain disease in retired NFL players has been, until very recently, a concerted effort of deception and denial. The NFL actively tried to and did conceal the extent of the concussion and brain trauma problem, the risk to Daniel E. Brabham, and the risks to anyone else that played football.

148.     The NFL's unparalleled status in the world of football gave the MTBI Committee's pronouncements on concussions authority and validity.   Daniel E. Brabham, therefore, reasonably relied on the NFL's pronouncements and/or its silence on this vital health issue.

149.     The MTBI Committee's stated goal was to present objective findings on the extent to which a concussion problem existed in the League, and to outline solutions.  Ironically, the MTBI Committee's studies were supposed to be geared toward "improv[ing] player safety" and for the purpose of instituting "rule changes aimed at reducing head injuries."

150.     By 1994, when the NFL formed the MTBI Committee, independent scientists and neurologists alike were already convinced that all concussions—even seemingly mild ones— were serious injuries that can permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently and without time to properly heal.

151.     The MTBI Committee was publicized by the NFL as independent from the NFL, consisting of a combination of doctors and researchers.

152.     The MTBI Committee, however, was not independent.  It consisted of at least five (5) persons who were already affiliated with the NFL.

153.    Instead of naming a noted neurologist to chair the MTBI Committee, or at least a physician with extensive training and experience treating head injuries, Commissioner Tagliabue appointed Dr. Elliot Pellman, a rheumatologist who lacked any specialized training or education relating to concussions, and who was a paid physician and trainer for the New York Jets.

154.    Dr. Pellman had reportedly been fired by Major League Baseball for lying to Congress regarding his resume.

155.    Dr. Pellman would chair the MTBI Committee from 1994-2007, and his leadership of the Committee came under frequent and harsh criticism related to his deficient medical training, background, and experience.

156.    The fact that Dr. Pellman was a paid physician for an NFL Team was an obvious conflict of interest.  At no time was Dr. Pellman independent of the NFL, because he was paid on an ongoing basis by an NFL Team.

157.    The NFL failed to appoint any neuropathologist to the MTBI Committee.

158.    From its inception in 1994, the MTBI Committee allegedly began conducting studies to determine the effect of concussions on the long-term health of NFL players.

159.    Current NFL Commissioner Goodell confirmed this in June 2007 when he stated publicly that the NFL had been studying the effects of traumatic brain injury for "close to 14 years …."

160.    Under Dr. Pellman, the MTBI Committee spearheaded a disinformation campaign.

161.    Dr. Pellman and two other MTBI Committee members, Dr. Ira Casson, a neurologist, and Dr. David Viano, a biomedical engineer, worked to discredit scientific studies

that linked head impacts and concussions received by NFL players to neuro-cognitive disorders and disabilities.

162. The MTBI Committee did not publish its first findings on active players until 2003. In that publication, the MTBI Committee stated, contrary to years of (independent) findings, that there was no long term negative health consequence associated with concussions.

163. The MTBI Committee published its findings in a series of sixteen (16) papers between 2003 and 2009. According to the MTBI Committee, all of their findings supported a conclusion that there was no long term negative health consequence associated with concussions or sub-concussive injuries sustained by NFL players. These findings regularly contradicted the research and experiences of neurologists who treat sports concussions and the players who endured them.

164. Completely contrary to peer reviewed scientific publications, the NFL's team of hand-picked so-called experts on the MTBI Committee did not find concussions to be of significant concern and felt it appropriate for players suffering a concussion to continue playing football during the same game or practice in which one was suffered. This recommendation and practice by the NFL, promoted by the MTBI Committee, was irresponsible and dangerous.

165. The MTBI Committee's methodology and the conclusions reached in its research were criticized by independent experts due to the numerous flaws in the study design, methodology, and interpretation of the data, which led to conclusions at odds with common medical knowledge and basic scientific protocol.

166. For example, in 2004 the MTBI Committee published a conclusion in which it claimed that its research found no risk of repeated concussions in players with previous

concussions and that there was no "7-to-10 day window of increased susceptibility to sustaining another concussion."

167.    In a comment to this publication, one independent doctor wrote that "[t]he article sends a message that it is acceptable to return players while still symptomatic, which contradicts literature published over the past twenty years suggesting that athletes be returned to play only after they are asymptomatic, and in some cases for seven days."

168.    As a further example, an MTBI Committee conclusion in 2005 stated that "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season." "These data suggest," the MTBI Committee reported, "that these players were at no increased risk" of subsequent concussions or prolonged symptoms such as memory loss, headaches, and disorientation.

169.    Yet, a 2003 NCAA study of 2,905 college football players found just the opposite: "Those who have suffered concussions are more susceptible to further head trauma for seven to 10 days after the injury."

170.    Support for this same conclusion was developed as early as 1982 in studies conducted at the University of Virginia.

171.    Dr. Pellman and his group stated repeatedly that the NFL study showed "no evidence of worsening injury or chronic cumulative effects of multiple [MTBI] in NFL players."

172.    The 2003 report by the Center for the Study of Retired Athletes at the University of North Carolina, however, found a link between multiple concussions and depression among former professional players with histories of concussions. A 2005 follow-up study by the Center

showed a connection between concussions and both brain impairment and Alzheimer's disease among retired NFL players.

173. Other contrary conclusions that the MTBI Committee published at the behest, urging, and sponsorship of NFL over several years include, but are not limited to, the following:

> Drs. Pellman and Viano stated that because a "significant percentage of players returned to play in the same game [as they suffered a concussion] and the overwhelming majority of players with concussions were kept out of football-related activities for less than 1 week, it can be concluded that mild [TBIs] in professional football are not serious injuries";

> that NFL players did not show a decline in brain function after a concussion;

> that there were no ill effects among those who had three (3) or more concussions or who took hits to the head that sidelined them for a week or more;

> that "no NFL player experienced the second-impact syndrome or cumulative encephalopathy from repeat concussions"; and

> that NFL players' brains responded and healed faster than those of high school or college athletes with the same injuries.

174. The MTBI Committee's papers and conclusions were against the weight of the scientific evidence and based on biased data-collection techniques. They received significant criticism in the scientific and medical media from independent doctors and researchers and were met with skepticism in peer review segments following each article's publication.

175. Moreover, the conclusions of the MTBI Committee completely contradicted the medical testimony Hall of Fame player Mike Webster submitted to the NFL in his application for disability, including the testimony the NFL's own paid expert submitted in connection with Mr. Webster's application.

176. Renowned experts Dr. Robert Cantu and Dr. Julian Bailes wrote harshly critical reviews of the studies' conclusions.

-37-

177. Dr. Cantu observed that the extremely small sample size and voluntary participation in the NFL's study suggested there was bias in choosing the sample. According to Dr. Cantu, no conclusions should be drawn from the NFL study.

178. A different scientist who reviewed the MTBI Committee's work further stated that the NFL appeared to be primarily preparing a defense for when injured players eventually sued, and that it seemed to be promoting a flawed scientific study to justify its conclusion that concussions do not have adverse effects on players.

179. Dr. Kevin Guskiewicz has stated that the "data that hasn't shown up makes their work questionable industry-funded research."

180. The MTBI Committee's work was criticized when repeated inconsistencies and irregularities in the MTBI Committee's data were revealed.

181. The MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players in the results of the Committee's studies on the effects of concussions and was selective in its use of injury reports.

182. The results reported by Dr. Pellman and the MTBI Committee selectively excluded at least 850 baseline tests. In a paper published in *Neurosurgery* in December 2004, Dr. Pellman and the other MTBI Committee members reported on the baseline data for 655 players and the results for 95 players who had undergone both baseline testing and post-concussion testing. They concluded that NFL players did not show a decline in brain function after suffering concussions. Their further analysis purportedly found no ill effects among those who had three or more concussions or who took hits to the head that kept them out for a week or more. The paper did not explain where the players in the study groups came from specifically or why certain player data was included and that data from hundreds of other players was not.

183.     Pellman subsequently fired William Barr, a neuropsychologist for the New York Jets, after Dr. Barr presented at a conference some NCAA study findings that contradicted NFL practices.

184.     As described in the following paragraphs, when faced with studies which tended to show a causal link between MTBI and cognitive degeneration, the NFL, through the MTBI Committee, produced contrary findings that were false, distorted, and deceptive to NFL players, participants in football nationwide, and the public at large.

185.     Between 2002 and 2007, Dr. Bennet Omalu examined the brain tissue of deceased NFL players, including Mike Webster, Terry Long, Andre Waters, and Justin Strzelczyk.  Dr. Omalu concluded that the players suffered from CTE.

186.     All of these individuals suffered multiple concussions during their NFL careers. Later in life, each exhibited symptoms of deteriorated cognitive functions, paranoia, panic attacks, and depression.

187.     Some of Dr. Omalu's findings were published in *Neurosurgery*.  Those findings included that Webster's and Long's respective deaths were partially caused by CTE and were related to multiple concussions suffered during their activity in the NFL.

188.     In response to Dr. Omalu's articles, the MTBI Committee wrote a letter to the editor of *Neurosurgery* asking that Dr. Omalu's article be retracted.

189.     In an article published in *Neurosurgery* in 2007, Dr. Cantu reached a similar conclusion regarding Waters as Dr. Omalu had reached as to Webster and Long.

190.     A 2003 study partially authored by Dr. Kevin Guskiewicz analyzed data from almost 2,500 retired NFL players and found that 263 of the retired players suffered from depression.  The study found that having three or four concussions meant twice the risk of

-39-

depression as never-concussed players and five or more concussions meant a nearly three-fold risk.

191.   The NFL's MTBI Committee attacked these studies.

192.   In November 2003, Dr. Guskiewicz was scheduled to appear on HBO's "Inside the NFL" to discuss his research. Dr. Pellman called Dr. Guskiewicz in advance and questioned whether it was in the best interest of Dr. Guskiewicz to appear on the program. On the program, Dr. Pellman stated unequivocally that he did not believe the results of the study led by Dr. Guskiewicz.

193.   In 2005, Dr. Guskiewicz performed a clinical follow-up study, and found that retired players who sustained three or more concussions in the NFL had a five-fold prevalence of mild cognitive impairment in comparison to NFL retirees without a history of concussions. In doing this research, Dr. Guskiewicz conducted a survey of over 2,550 former NFL athletes.

194.   The MTBI Committee attacked and sought to undermine the study, issuing the following excuse and delay tactic: "We want to apply scientific rigor to this issue to make sure that we're really getting at the underlying cause of what's happening. . . . You cannot tell that from a survey."

195.   In August 2007, the NFL, in keeping with its scheme of fraud and deceit, issued a concussion pamphlet to players which stated:

> Current research with professional athletes has not shown that having more than one or two concussions leads to permanent problems if each injury is managed properly. It is important to understand that there is no magic number for how many concussions is too many. Research is currently underway to determine if there are any long-term effects of concussion[s] in NFL athletes.

196.   In a statement made around the time that the concussion pamphlet was released, NFL Commissioner Roger Goodell said, "We want to make sure all NFL players . . . are fully

informed and take advantage of the most up to date information and resources as we continue to study the long-term impact of concussions." The NFL decided that the "most up to date information" did not include the various independent studies indicating a causal link between multiple concussions and cognitive decline in later life.

197. Goodell also stated, "[b]ecause of the unique and complex nature of the brain, our goal is to continue to have concussions managed conservatively by outstanding medical personnel in a way that clearly emphasizes player safety over competitive concerns."

198. Daniel E. Brabham relied to his detriment on the NFL's disinformation, all of which was contrary to the findings of the independent scientists who had studied the issue, including Drs. Guskiewicz, Cantu, Omalu, and Bailes, regarding the causal link between multiple head injuries and concussions and cognitive decline.

199. The NFL's conflict of interest and motive to suppress information regarding the risks of repetitive traumatic brain injuries and concussions was vividly demonstrated by Dr. Pellman's treatment of a concussion sustained by former star New York Jets player Wayne Chrebet. This occurred in 2003, the same time period when Dr. Pellman chaired the MTBI Committee.

200. In November 2003, Chrebet sustained a concussion from another player's knee to the back of his head. The impact left him face down on the field in an unconscious state for several minutes. Once Chrebet was on the sideline and conscious, Dr. Pellman administered tests. Dr. Pellman knew that Chrebet had sustained a concussion, but reportedly Chrebet performed adequately on standard memory tests. According to reports, Dr. Pellman asked Chrebet some questions, including whether he was "okay." Chrebet responded that he was. Reportedly, Dr. Pellman told Chrebet that, "This is very important for your career," and sent

-41-

Chrebet back into the game. Shortly thereafter, Chrebet was diagnosed with post-concussion syndrome and kept out of games for the remainder of the 2003 season.

201. Today, Chrebet is 38 years old and reportedly suffers from depression and memory problems.

202. In 2005, the MTBI Committee published a paper that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season."

203. Facing increasing media scrutiny over the MTBI Committee's questionable studies, Dr. Pellman eventually resigned as chair of the Committee in February 2007. He was replaced as chair by Dr. Ira Casson and Dr. David Viano, but remained a member of the Committee.

204. Dr. Guskiewicz, research director of the University of North Carolina's Center for the Study of Retired Athletes, said at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

205. Regarding Dr. Pellman's work, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions," but "[Dr. Pellman] continued to say on the record that's not what they find and there's no truth to it."

206. Drs. Casson and Viano continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries. In 2007, in a televised interview on HBO's Real Sports, Dr. Casson unequivocally stated that there was no link between concussions and depression, dementia, Alzheimer's disease, or "anything like [that] whatsoever."

-42-

207. In June 2007, the NFL convened a concussion summit for team doctors and trainers. Independent scientists, including Drs. Cantu, and Guskiewicz, presented their research to the NFL.

208. Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the MTBI Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL head injuries with cognitive decline. Dr. Bailes recalled that the MTBI's Committee's reaction to his presentation was adversarial: "The Committee got mad . . . we got into it. And I'm thinking, 'This is a . . . disease in America's most popular sport and how are its leaders responding? Alienate the scientist who found it? Refuse to accept the science coming from him?'"

209. At the summit, Dr. Casson told team doctors and trainers that CTE has never been scientifically documented in football players.

210. After reviewing five years of data of on-field concussions, the NFL falsely concluded that there was no evidence for an increase in secondary brain injuries after a concussion.

211. In 2008, Boston University's Dr. Ann McKee found CTE in the brains of two more deceased NFL players, John Grimsley and Tom McHale. Dr. McKee stated, "the easiest way to decrease the incidence of CTE [in contact sport athletes] is to decrease the number of concussions." Dr. McKee further noted that "[t]here is overwhelming evidence that [CTE] is the result of repeated sublethal brain trauma."

212. A MTBI Committee representative characterized each study as an "isolated incident" from which no conclusion could be drawn, and said he would wait to comment further until Dr. McKee's research was published in a peer-reviewed journal. When Dr. McKee's

-43-

research was published in 2009, Dr. Casson asserted that "there is not enough valid, reliable or objective scientific evidence at present to determine whether . . . repeat head impacts in professional football result in long[-]term brain damage."

213.    In 2008, under increasing pressure, the NFL commissioned the University of Michigan's Institute for Social Research to conduct a study on the health of retired players. Over 1,000 former NFL players took part in the study. The results of the study, released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population---including a rate of 19 times the normal rate for men ages 30 through 49."

214.    The NFL, who commissioned the study, responded to these results by claiming that the study was incomplete, and that further findings would be needed. NFL spokesperson Greg Aiello stated that the study was subject to shortcomings and did not formally diagnose dementia. Dr. Casson implied that the Michigan study was inconclusive and stated that further work was required. Other experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

## The Congressional Inquiry and
## The NFL's Acknowledgement of the Concussion Crisis

215.    Shortly after the results of the Michigan study were released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

216.    Drs. Cantu and McKee testified before the House of Representatives, Committee on the Judiciary, to discuss the long-term impact of football-related head injuries.

217.    At the first hearing in October 2009, NFL Commissioner Roger Goodell acknowledged that the NFL owes a duty to the public at large to educate them as to the risks of

concussions due to the League's unique position of influence: "In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well. We must act in their best interests even if these young men never play professional football."

218. When Representative Linda Sanchez questioned Goodell about the limited nature of the NFL's purported studies on repetitive traumatic brain injuries and concussions, the conflicts of interest of those directing the studies, and the potential for bias, Goodell evaded answering the questions.

219. On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry, 26, who played in the NFL from 2004 to 2009, died after falling from the back of a truck. Drs. Omalu and Bailes performed a postmortem study on Henry's brain and diagnosed him with CTE.

220. In January 2010, the House Judiciary Committee held further hearings on football player head injuries. Representative Conyers observed that "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

221. Representative Sanchez commented that "[i]t seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?"

222. In the 2010 Congressional hearings, Dr. Casson gave testimony that denied the validity of other non-NFL studies and stated that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

223. The members of the MTBI Committee, however, knew of the decades-old studies linking MTBI to long-term neurological problems. Casson, a MTBI Committee member since

its inception, stated before Congress on January 4, 2010, that he was "the lead author of a landmark paper on brain damage in modern boxers that was published in the [Journal of the American Medical Association] in 1984." That paper, which referenced the many studies documenting CTE in boxers, studied eighteen former and active boxers and found that eighty-seven percent of the professional boxers had definite evidence of brain damage. Specifically, the study determined that the subjects performed particularly poorly on neuropsychological tests measuring short-term memory.

224. In his written statement to Congress, Casson stated that he has "been concerned about the possibility of long term effects on the brain related to football for close to thirty years." Dr. Casson offered that one of the reasons he "was asked to be on the NFL MTBI committee was because of [his] knowledge of and experience treating boxers with chronic traumatic encephalopathy (CTE)."

225. This testimony contradicted Casson's testimony that "there is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

226. On February 1, 2010, Dr. Omalu spoke before members of the House Judiciary Committee at a forum in Houston, Texas with regard to "Head and Other Injuries in Youth, High School, College, and Professional Football." In his prepared testimony, he explained:

> Glenn Pop Warner [1871 – 1954] founded the Pop Warner youth football league in 1929. He still remains one of the greatest football coaches in the history of American football. The single event, which necessitated the use of pads and helmets by football players took place in 1888 when the annual rules convention for the emerging sport of college football passed a rule permitting tackling below the waist.
>
> Football changed dramatically. Teams no longer arrayed themselves across the entire breath of the field. Teams bunched themselves around the runner to block for him. The wedge and mass play

arrived. Football became, for a time, a savage sport full of fights, brawling, even fatalities."

In 1912, Pop Warner said: "Playing without helmets gives players more confidence, saves their heads from many hard jolts, and keeps their ears from becoming torn or sore. I do not encourage their use. I have never seen an accident to the head which was serious, but I have many times seen cases when hard bumps on the head so dazed the player receiving them that he lost his memory for a time and had to be removed from the game."

We have known about concussions and the effects of concussions in football for over a century. Every blow to the head is dangerous. Repeated concussions and sub-concussions both have the capacity to cause permanent brain damage. During practice and during games, a single player can sustain close to one thousand or more hits to the head in only one season without any documented or reported incapacitating concussion. Such repeated blows over several years, no doubt, can result in permanent impairment of brain functioning especially in a child.

227.     After the Congressional hearings, the NFLPA called for the removal of Dr. Casson as MTBI Committee co-chair, and stated, "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject."

228.     In 2010, the NFL re-named the MTBI Committee the "Head, Neck, and Spine Medical Committee" (the "Medical Committee") and announced that Dr. Pellman would no longer be a member of the panel. Drs. H. Hunt Batjer and Richard G. Ellenbogen were selected to replace Casson and Viano. The two new co-chairmen selected Dr. Mitchel S. Berger to serve on the new Medical Committee.

229.     Under its new leadership, the Committee admitted that data collected by the NFL's formerly appointed brain-injury leadership was "infected," and said that their Committee should be assembled anew. The Medical Committee formally requested that Dr. Pellman not speak at one of its initial conferences.

-47-

230. During a May 2010 Congressional hearing, a Congressman made it plain to Drs. Batjer and Ellenbogen that the NFL: "[had] years of an infected system here, and your job is . . . to mop [it] up."

231. Shortly after the May 2010 hearing, Dr. Batjer was quoted as admitting, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

232. In June 2010, scientific evidence linked multiple concussions to yet another degenerative brain disease—Amyotrophic Lateral Sclerosis ("ALS"), commonly referred to as "Lou Gehrig's Disease."

233. On February 17, 2011, former Chicago Bears and New York Giants player Dave Duerson committed suicide. Fifty years old at the time, Duerson had suffered months of headaches, blurred vision, and faltering memory.

234. Before his death, Duerson wrote a final note that asked that his brain be given to the NFL brain bank for evaluation. After his death, Dr. Cantu determined that Duerson was suffering from CTE.

235. When this information was reported, NFLPA Executive Director DeMaurice Smith stated that the fact that Duerson was suffering from CTE

> makes it abundantly clear what the cost of football is for the men who played and the families. It seems to me that any decision or course of action that doesn't recognize that as the truth is not only perpetuating a lie, but doing a disservice to what [Duerson] feared and what he wanted to result from the donation of his brain to science.

-48-

236. In July 2011, John Mackey, former tight end of the Baltimore Colts died. Mackey was diagnosed with front temporal lobe dementia in 2007, forcing him to live full-time in an assisted living facility.

### The NFL's New Committee

237. In October 2011, Dr. Mitchel Berger of the NFL's new Head, Neck, and Spine Medical Committee announced that a new study was in the planning process. He admitted that the MTBI Committee's previous long-range study was useless because "[t]here was no science in that." Dr. Berger further stated that data from the previous study would not be used. "We're really moving on from that data. There's really nothing we can do with that data in terms of how it was collected and assessed."

238. Why in 1994 (and far earlier) the NFL (and its MTBI Committee) failed to share accurate information and take appropriate actions is difficult to comprehend in light of the fact that the NFL has known for decades that multiple blows to the head can lead to long-term brain injury, including memory loss, dementia, depression, and CTE and its related symptoms. Instead, the NFL misled players, coaches, trainers, and the public, and actively spread disinformation.

239. It took decades for the NFL to admit that there was a problem and sixteen years to admit that its information was false and inaccurate. The NFL's conduct in this regard is willful and wanton and exhibits a reckless disregard for the safety of its players and the public at large. At a minimum, the NFL acted with callous indifference to the duty it voluntarily assumed to Daniel E. Brabham and to players at every level of the game.

240. As a direct result of the fraudulent concealment and misrepresentations by the NFL, former players have for many decades been led to believe that the symptoms of early-onset

dementia, ALS, loss of memory, headaches, confusion, and the inability to function were not caused by events occurring while they played in the NFL. And, as a result of this willful and malicious conduct, these former players have been deprived of medical treatment, incurred expenses, lost employment, suffered humiliation, and sustained other damages to be specified.

## COUNT I
## ACTION FOR DECLARATORY RELIEF – LIABILITY
### (Plaintiff TRICOU BRABHAM, individually and as personal representative of the Estate of DANIEL E. BRABHAM, Deceased, Against the NFL)

241. Plaintiff repeats and realleges paragraphs 1 through 240 set forth above as if fully set forth herein.

242. There is a case and controversy among plaintiff Tricou Brabham, individually and as personal representative of the Estate of DANIEL E. BRABHAM, Deceased, on the one hand and the NFL on the other.

243. Pursuant to C.P.L.R 3001 Plaintiff Tricou Brabham, individually and as personal representative of the Estate of DANIEL E. BRABHAM, Deceased, seeks a declaration as to the following:

    a)      that the Defendant NFL knew or reasonably should have known, at all times material, that the repeated traumatic head impacts sustained by Daniel E. Brabham while playing NFL football were likely to expose him to excess risk of neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, or similar cognitive-impairing conditions;

    b)      that based on the Defendant NFL's voluntary undertaking to study the issue of MTBI, it had a duty to advise Daniel E. Brabham of the heightened risk, so that they could act to mitigate the damage Daniel E. Brabham had already sustained;

-50-

c)    that Defendant NFL willfully and intentionally concealed from and misled Daniel E. Brabham concerning that risk and the cause of the damage he sustained; and

d)    that between 1961 and 1969 and on and ongoing basis in the decades since that time period, the NFL recklessly endangered Daniel E. Brabham by failing to inform him of the damage he would and did sustain.

## COUNT II
## FRAUDULENT CONCEALMENT
**(Plaintiff TRICOU BRABHAM, Individually and as personal representative of the Estate of DANIEL E. BRABHAM, Deceased, Against the NFL)**

244.    Plaintiff Tricou Brabham repeats and realleges paragraphs 1 through 243 set forth above as if fully set forth herein.

245.    Between the early 1950s and 1994, which includes the time period within which Daniel E. Brabham played the game, the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players that was similar or identical to the risk of harm, for example, to boxers who receive repetitive impacts to the head during boxing practices and matches.

246.    The NFL has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which NFL players are exposed.

247.    During that time period, the NFL knowingly and fraudulently concealed from then-current NFL players, including Daniel E. Brabham, the risks of head injuries in NFL games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

-51-

248.    From 1994 through June of 2010, the NFL's fraudulent concealment continued and took on a more active dimension. During that time period, the NFL voluntarily funded and produced its own purported scientific research and through that research repeatedly misrepresented to then-current and former NFL players, the United States Congress, and the general public that there is no link (or an insufficient scientific link) between sub-concussive and/or concussive head impacts in NFL games and practices and later-in-life cognitive/brain injury, including CTE and its related symptoms.

249.    Given the NFL's superior and unique vantage point, Daniel E. Brabham reasonably looked to the NFL for guidance on head injuries and concussions, including the later-in-life consequences of the repetitive head impacts he sustained while a player in the NFL.

250.    The NFL's MTBI Committee published articles and the concussion pamphlet referenced above, all of which concealed and minimized the risks of repetitive brain impacts the NFL knew existed for its then-current players and for its former players, such as Daniel E. Brabham, who reasonably relied on the NFL's false pronouncements and/or silence on this vital health issue.

251.    The NFL's concussion pamphlet created an atmosphere of trust that the NFL had carefully undertaken its voluntary responsibility to research, test, study, and report accurate findings to the players and former players. The NFL stated that "[w]e want to make sure all NFL players ... are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact of concussions."

252.    The concealment was ongoing. Dr. Ira Casson provided oral and written testimony at the 2010 congressional hearings in which he continued to deny the validity of other

studies. Dr. Casson also denied the link between repetitive brain impacts and short- and long-term brain damage in public interviews.

253. The NFL, therefore, concealed material facts and information with the intent to deceive and defraud, which caused Daniel E. Brabham to become increasingly exposed to the ongoing harm referenced above, both as a player, when he was sustaining sub-concussive and/or concussive brain impacts, and later as a retired player, when the insidious and latent effects of the injuries were ongoing and developing.

254. The NFL's concerted concealment of the risks to which Daniel E. Brabham had been exposed delayed his ability to plan for his future, to plan for his family's future, and to seek appropriate treatment of this latent neurodegenerative condition.

255. The NFL knew and expected that Daniel E. Brabham would rely on the inaccurate information provided by the NFL, and Daniel E. Brabham in fact did reasonably rely on the inaccurate information provided by the NFL during and after his NFL career.

256. As a direct and proximate result of the NFL's fraudulent conduct, Daniel E. Brabham has suffered physical injury, including, but not limited to, existing and latent neuro-cognitive conditions that create memory loss, diminished cognitive function, ultimately leading to death, and non-economic losses, and economic losses.

257. As a result of the NFL's misconduct as alleged herein, the NFL is liable to Daniel E. Brabham's estate and wife for the full measure of damages allowed under applicable law.

## COUNT III
## FRAUD
**(Plaintiff TRICOU BRABHAM, Individually and as personal representative of the Estate of DANIEL E. BRABHAM, Deceased, Against the NFL)**

258. Plaintiff Tricou Brabham repeats and realleges paragraphs 1 through 257 set forth above as if fully set forth herein.

259.   At least since the early 1950s the NFL knew that repetitive head impacts in football games and full-contact practices created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive the same or similar repetitive impacts to the head during boxing practices and matches.

260.   The NFL knew that the risks of brain injury could be reduced by implementing changes to the game, akin to the ones the NFL belatedly adopted in 2011, such as (1) the baseline cognitive testing of players for comparison purposes during and after contact play, (2) the active monitoring of players for signs of MTBI, (3) the employment of a neurologist on the sidelines, and (4) return-to-play rules consistent with proper medical management of MTBI.

261.   Given the NFL's superior and unique vantage point and its historical role as the guardian of player safety,  Daniel E. Brabham reasonably looked to the NFL for guidance on all issues related to repetitive head impacts, sub-concussive injuries, and concussive injuries.

262.   The NFL, however, withheld the information it knew about the risks of head injuries in football from, among other players, Daniel E. Brabham.

263.   On information and belief, the NFL deliberately delayed implementing changes to the game it knew could reduce players' exposure to the risk of life-altering head injuries, because those changes would be expensive and would reduce the NFL's profitability.

264.   The NFL has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which all NFL players are exposed, particularly players on the offensive line, such as Daniel E. Brabham.

265.   Before and during Daniel E. Brabham's playing years, the NFL purposefully ignored, was willfully blind, and/or actively concealed the brain injury risk to which it exposed

-54-

NFL players, including Daniel E. Brabham. The NFL's conduct continued for the decades after Daniel E. Brabham retired, including up through 2010.

266. In 1994, the NFL and its agents took their concealment activities another step. The NFL, its agents, and its consultants agreed to use the MTBI Committee to populate the published scientific literature with "studies" that disputed the conclusions of independent researchers regarding the long-term chronic disabilities and injuries associated with head injury and that made material misrepresentations with the intent to defraud the then-current NFL players and former NFL players, including Daniel E. Brabham.

267. Beginning in 1994, the NFL and its agents funded and created a falsified body of purported scientific research that misrepresented to then-current NFL players, all former NFL players, the United States Congress, and the general public that there was no scientifically proven link between repetitive sub-concussive and concussive injuries sustained during football and brain injury, including but not limited to CTE and its related symptoms.

268. The NFL, its agents, and its consultants made these material misrepresentations with the intent to defraud all former players, including Daniel E. Brabham.

269. During his playing days and after his retirement from the NFL, Plaintiff and the decedent Daniel E. Brabham justifiably and reasonably relied on the NFL's omissions and misrepresentations to his detriment.

270. As a result of the NFL's misconduct as alleged herein, the NFL is liable to Plaintiff Tricou Brabham, Individually and as personal representative of the Estate of Daniel E. Brabham, deceased.

271. Plaintiff Tricou Brabham, Individually and as personal representative of the Estate of Daniel E. Brabham, deceased has been damaged by the NFL's misconduct. Plaintiffs

and/or Decedent suffered substantial injuries, emotional distress, pain and suffering, leading to death of decedent, and economic and non-economic damages that are ongoing and continuing in nature.

272.    As a result of the NFL's fraud, the NFL is liable to Plaintiff Tricou Brabham, Individually and as personal representative of the Estate of Daniel E. Brabham, deceased, for the full measure of damages allowed under applicable law.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**(Plaintiff TRICOU BRABHAM, Individually and as personal representative**
**of the Estate of DANIEL E. BRABHAM, Deceased, Against the NFL)**

273.    Plaintiff Tricou Brabham repeats and realleges paragraphs 1 through 272 set forth above as if fully set forth herein.

274.    A special relationship existed between the NFL and Daniel E. Brabham sufficient to impose a duty on the NFL to disclose accurate information to him.

275.    Prior to 1994, and during the years when Daniel E. Brabham played in the NFL, the NFL knew that repetitive head impacts in football games and practices created a risk of harm to NFL players that was similar or identical to the risk of harm to boxers who receive repetitive impacts to the head during boxing practices and matches.

276.    Prior to 1994, the NFL was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which NFL players were exposed.

277.    The NFL, however, withheld this information from NFL players, including Daniel E. Brabham, ignored the risks to NFL players, and/or was willfully blind to the risk and likely harm.

278.    Before June of 2010, the NFL made material misrepresentations to its players, former players, the United States Congress, and the public at large that there was no scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

279.    Defendant NFL, therefore, failed to reveal and/or negligently misrepresented the dangers Daniel E. Brabham faced in returning to action after sustaining a sub-concussive and/or concussive head injury and the long-term effects of continuing to play football after such an injury.

280.    Further, from 1994 forward, the NFL's MTBI Committee made public statements, published articles, and issued the concussion pamphlet to its players, which the NFL knew or should have known were misleading, because it downplayed and obfuscated to NFL players (and former NFL Players such as Daniel E. Brabham) the true and serious risks of repetitive traumatic head impacts.

281.    The MTBI Committee made material misrepresentations on multiple occasions, including but not limited to testimony at congressional hearings and other information issued to current and former NFL Players.

282.    At all times, both before and after 1994, Daniel E. Brabham's reliance on the NFL was reasonable, given the NFL's superior and unique vantage point on the risks associated with repetitive sub-concussive and concussive head impacts during NFL games and practices.

283.    The NFL's misrepresentations included the false statement that present NFL players were not at an increased risk of short-term and long-term adverse consequences if they returned too soon to an NFL games or practices after suffering head trauma. The NFL, therefore,

-57-

also misrepresented to Daniel E. Brabham that he had not been exposed to such increased risk during his playing career in the NFL.

284.    The NFL's misrepresentations included ongoing and baseless criticism of legitimate scientific studies that set forth the dangers and risks of head impacts which NFL players regularly sustained.

285.    The NFL made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position of knowledge, that NFL players of every era, including Daniel E. Brabham, faced serious health problems if they returned to a game too soon after sustaining a concussion.

286.    The NFL knew or should have known the misleading nature of its statements when it made the statements.

287.    The NFL made the misrepresentations and actively concealed information knowing that former NFL players, such as Daniel E. Brabham, would and did rely on the misrepresentations or omissions in, among other things, how he addressed the concussive and sub-concussive injuries he sustained.

288.    For Daniel E. Brabham, who had retired prior to the NFL active misrepresentations made between 1994 and 2010, the NFL's concerted misrepresentations and concealment of the risks to which he had been exposed on the playing field delayed his ability to plan for his future, to plan for his family's future, and to seek appropriate treatment for his latent neurodegenerative conditions.

289.    As a result of the NFL's misrepresentations, the NFL is liable to Daniel E. Brabham's estate and wife.

290.    As a direct and proximate result of the NFL's negligent misrepresentations, Daniel E. Brabham suffered serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, leading to death, loss of income, pain and suffering, emotional distress, and loss of consortium. Plaintiff Tricou Brabham, Individually and as personal representative of the Estate of Daniel E. Brabham, deceased, seeks the full measure of damages allowed under applicable law.

**COUNT V**
**NEGLIGENCE**
**(Plaintiff TRICOU BRABHAM, Individually and as personal representative**
**of the Estate of Daniel E. Brabham, Deceased, Against the NFL)**

291.    Plaintiff Tricou Brabham repeats and realleges paragraphs 1 through 290 as set forth above as if fully set forth herein.

292.    In 1922, the American Professional Football Association became the National Football League and in 1933, the NFL began developing rules and regulations of play that were significantly different then those previously followed and were used by collegiate football leagues.

293.    In 1937, the American Football Coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

294.    Between 1933 and 1968, the NFL assumed and carried out a duty to supervise how the game of football was played in the United States.

295.    Between 1933 and 1968, the NFL assumed and carried out a duty to inform and advise players and teams of the foreseeable harm that can arise from such things as the use of leather helmets, the need to wear hard plastic helmets to reduce head wounds and internal injury (1943) and the grabbing of an opponent's facemask—to minimize or avoid head and neck injuries (1956/1962). These warnings and imposed safety rules were furnished by the NFL

-59-

because it had assumed a duty to provide a safe environment for players and because of its superior knowledge of the risks of injury to players.

296. Based on information and belief, the NFL voluntarily inserted itself into the tasks assumed by others to develop helmet safety standards to reduce the risk of head injury while playing football. Despite its voluntary participation in these activities, the defendant negligently failed to adopt these standards for a considerable period of time after others had done so.

297. During this time period, the NFL knew or should have known of medical or scientific literature regarding the risks of short- and long-term neuro-cognitive disabilities and deficits to athletes exposed to MTBI.

298. During this time period, the NFL knew or should have known that repetitive sub-concussive and concussive blows to the heads of NFL players can and do result in short-term and long-term brain damage.

299. During this time period, the NFL knew or should have known that it was the practice in the NFL to compel or cajole players to play with injuries, including sub-concussive injuries, concussive injuries and injuries involving a loss of consciousness.

300. During this time period, the NFL had superior knowledge (as compared to the NFL players themselves) that athletic sporting events causing sub-concussive and concussive injuries posed a serious risk of short-term and long-term cognitive disabilities.

301. The NFL's failure to address the continuing health risks associated with sub-concussive and/or concussive injuries that NFL players sustained constituted a breach of its duty to these players, which has resulted in long term neuro-cognitive problems and disabilities to former NFL players, including Daniel E. Brabham.

302. During this time period, the NFL continued to perpetrate the dangerous myth that NFL players are tough and can withstand "getting their bell rung," "suffering dings," or temporarily losing consciousness while playing constitutes causative negligence. The perpetration of misleading and false statements and a philosophy of invincibility nurtured and publicized by the NFL throughout this time period constitutes continuing negligent conduct which the NFL never stopped perpetrating until subject to Congressional scrutiny and the civil lawsuits brought by former NFL players for brain trauma.

303. Given the NFL's superior and unique vantage point on the issue of head injuries and concussions, Daniel E. Brabham reasonably relied to his detriment on the NFL's actions and omissions on this subject.

304. The failure of the NFL to publicize within the League—to active players—and to the public at large, including retired players, the mounting evidence in the scientific literature of the evolving and chronic neuro-cognitive problems amongst former players caused then-current players and retired players to believe that their physical and psychological problems (as described herein) were neither serious nor related to football. These commissions or omissions caused Daniel E. Brabham to ignore the need for necessary treatment. Likewise, these omissions and commissions had the institutional effect of reducing the interest in helmet safety research, avoiding changes in rule-playing to minimize head injury, avoiding the need to promulgate return-to-play rules that specifically addressed sub-concussive and concussive events, and establishing programs to educate players about the long-term health risks of sub-concussive and concussive impacts.

305. Increasingly during this time period, the NFL (and the marketing arm of the NFL) marketed the game of football as acceptably violent, and it rewarded its most violent players.

This marketing technique was directed to the general public, the football community of players associated with organized football from sandlot to college. In pursuing these concerted marketing techniques, the defendant knew or should have known that its conflation of concussive-inducing violence with heroism would induce NFL players and those who aspired to play in the NFL to play with reckless violence.

306. In its marketing scheme, the NFL developed print and film packages that were widely distributed throughout the United States to media outlets and organized football programs as a powerful method to convince current players and those in college and high school football that the greater the hit the bigger the accolades.

307. In the early 1990s, the NFL voluntarily undertook to study the issue of neurocognitive injuries in former NFL players.

308. In 1994, in connection with that voluntary undertaking, the NFL created the aforementioned MTBI Committee.

309. The NFL recognized that its voluntary undertaking to study and report information about the effect of head impacts on NFL players would not just be for the benefit of then-present and former NFL players alone. Since the NFL is the most prominent and influential entity in the sport of football, the NFL knew or should have known that the NFL MTBI Committee's statements would have a broad public impact.

310. By voluntarily undertaking to study and report on the issue of the neurocognitive effects of head impacts in professional football, the NFL assumed a duty to exercise reasonable care in the MTBI Committee's work and the NFL and its agents' public statements about the substance of the Committee's work.

311.    However, the MTBI Committee negligently performed the NFL's voluntarily undertaken research mission.

312.    In addition, from 1994 through June of 2010, the NFL and its MTBI Committee made material misrepresentations to players, former players (such as Daniel E. Brabham), the United States Congress, and the public at large that there was no scientifically valid link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms.

313.    The NFL's failure to exercise reasonable care in its voluntarily assumed duty that began in 1994 increased the risk that former NFL players such as Daniel E. Brabham would be lulled into believing that he had not suffered long-term neuro-cognitive injuries and would not act to address the problems that arose from those injuries.

314.    Daniel E. Brabham reasonably relied to his detriment on the NFL's actions and omissions on the subject.

315.    Under all of the above circumstances, it was foreseeable that the NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties would cause or substantially contribute to the personal injuries suffered by Daniel E. Brabham.

316.    The NFL's failure to exercise reasonable care in the execution of its voluntarily undertaken duties proximately caused or contributed to Daniel E. Brabham's latent and progressive injuries.

317.    As a result of the NFL's negligence, the NFL is liable to Plaintiff Tricou Brabham Individually and as personal representative of the Estate of Daniel E. Brabham, deceased, who is entitled to and seeks all damages allowed by applicable law.

COUNT VI
NEGLIGENT HIRING
(Plaintiff TRICOU BRABHAM. Individually and as personal representative
of the Estate of DANIEL E. BRABHAM, Deceased, Against the NFL)

318.    Plaintiff Tricou Brabham repeats and realleges paragraphs 1 through 317 set forth above as if fully set forth herein.

319.    The NFL voluntarily and gratuitously inserted itself into the business of studying (and subsequently rendering expert opinions about) the relationship between repetitive head impacts in football and brain injury.

320.    In doing so, the NFL assumed a duty to Decedent Daniel E. Brabham and the general public to retain and employ persons within the MTBI Committee who were professionally competent to study and render opinions on the relationship between repetitive head impacts in football and brain injury and to ensure that those whom it hired had no conflict of interest and that each had the professional and personal qualifications to conduct those studies and render opinions that were scientifically rigorous, valid, defensible, and honest.

321.    The NFL breached its duty to Daniel E. Brabham and the general public by hiring persons who:

       a.    were unqualified;

       b.    were not competent to engage in rigorous and defensible scientific research;

       c.    were not competent to render valid and defensible opinions;

       d.    created fraudulent industry-funded research; and/or

e. attacked as not credible the valid and defensible research and opinions generated by neuro-scientists who were unconnected to and not paid by the NFL.

322. The NFL's negligence in this regard resulted in a body of falsified industry-funded research that purposefully and/or negligently contested and suppressed valid and truthful bio-medical science. The NFL's negligence allowed the MTBI Committee to use falsified industry-funded research to mislead all former NFL players (including Daniel E. Brabham), and the general public regarding the risks associated with repetitive head impacts in the game of football.

323. As a result of the NFL's negligence, the Plaintiff Tricou Brabham, Individually and as personal representative of the Estate of Daniel E. Brabham, deceased, sustained ongoing and progressive brain injuries and did not take the protective measures or seek the diagnosis and treatment he would have sought had the NFL told decedent the truth.

## COUNT VII
## NEGLIGENT RETENTION
**(Plaintiff TRICOU BRABHAM, Individually and as personal representative of the Estate of DANIEL E. BRABHAM, Deceased, Against the NFL)**

324. Plaintiff Tricou Brabham repeats and realleges paragraphs 1 through 323 set forth above as if fully set forth herein.

325. The NFL knew or should have known that the controlling members of the MTBI Committee demonstrated an ongoing lack of competence, objectivity and inadequate judgment to study and render expert opinions on the issue of the relationship between repetitive head impacts in football and brain injury.

326.    The NFL voluntarily assumed a duty to Daniel E. Brabham and the general public not to allow those incompetent persons it had hired within the MTBI Committee to continue to conduct incompetent and falsified studies and render incompetent opinions on the relationship between repetitive head impacts in football and brain injury.

327.    During the time period when the MTBI Committee was conducting its purported research and rendering its purported opinions, the NFL knew or should have known that the purported research and opinions of the MTBI Committee were false and indefensible.

328.    The NFL breached its duty to Daniel E. Brabham and the general public by allowing these incompetent and unqualified persons, under the auspices and with the imprimatur of the NFL:

    a.    to continue to create incompetent and indefensible research,

    b.    to continue to render invalid and indefensible opinions, and

    c.    to continue to attack the credible and defensible research and opinions of neuro-scientists not connected to or paid by the NFL.

329.    The NFL's negligence allowed the incompetent members of the MTBI Committee to continue to advance their false and incompetent research and opinions in an attempt to suppress valid bio-medical science. The NFL's negligence allowed the MTBI Committee members to mislead Daniel E. Brabham, other former NFL players, and the general public regarding the permanent brain injury risks associated with repetitive head impacts in the game of football.

330.    As a result of the NFL's negligence, the decedent Daniel E. Brabham sustained progressive brain injuries and did not take the protective measures or seek the diagnosis and treatment he would have sought had the NFL told him the truth.

### COUNT VIII
### CIVIL CONSPIRACY/FRAUDULENT CONCEALMENT
**(Plaintiff TRICOU BRABHAM, Individually and as personal representative of the Estate of DANIEL E. BRABHAM, Deceased, Against all Defendants)**

331.    Plaintiff Tricou Brabham repeats and reallages paragraphs 1 through 330 set forth above as if fully set forth herein.

332.    For decades, the NFL and NFL Properties, along with others who were consultants and agents of the NFL, including those consultants who participated in the MTBI Committee, acted in concert to conceal from NFL players and the public the link between repetitive head impacts in football and long-term neuro-cognitive damage, illness, and decline.

333.    The Defendants, along with those who participated in the concerted efforts referenced above, knowingly failed to disclose and/or made continuing misrepresentations of material fact that there was an absence of any scientific basis to believe that repetitive head impacts in football games and practices created any known long-term neuro-cognitive risks to present or former NFL players. The misconduct by the Defendants, its consultants, and agents exposed Daniel E. Brabham to an increased risk of brain injury and was the proximate cause of the brain injuries from which Decedent suffered.

334.    Plaintiff Tricou Brabham, Individually and as personal representative of the Estate of Daniel E. Brabham, deceased, therefore, has suffered personal injuries as a result of the improper concerted activities of the NFL and its agents and consultants.

### COUNT IX
### LOSS OF CONSORTIUM
**(Plaintiff TRICOU BRABHAM Against the NFL)**

-67-

335.    Plaintiff Tricou Brabham repeats and reallages paragraphs 1 through 334 set forth above as if fully set forth herein.

336.    As a result of the NFL's misconduct, the NFL is liable to Plaintiff Tricou Brabham.

337.    As a direct and proximate result of the intentional misconduct, carelessness, negligence, and recklessness, Decedent Daniel E. Brabham has sustained the injuries as set forth above, and the Plaintiff Tricou Brabham has been damaged as follows:

      a.    She has been and will continue to be deprived of the services, society and companionship of her husband;

      b.    She has been required to spend money for medical care and household care for the treatment of her husband; and

      c.    She has been and will continue to be deprived of the earnings of her husband, but for the injuries he has sustained as a result of the conduct of the NFL.

338.    As a result of the NFL's misconduct and the injuries sustained by Decedent Daniel E. Brabham, Plaintiff Tricou Brabham is entitled to damages, as alleged herein or allowed by law.

## COUNT X
## WRONGFUL DEATH
### (Plaintiff TRICOU BRABHAM, Individually and as personal representative of the Estate of DANIEL E. BRABHAM, Deceased, Against all Defendants)

339.    Plaintiff Tricou Brabham repeats and reallages paragraphs 1 through 330 set forth above as if fully set forth herein.

340    The Decedent's legal representative brings this action in her representative capacity of the decedent's Estate and as next of kin and on behalf of the respective survivors of the Decedent.

341    As a direct and proximate cause of the conduct alleged herein, the NFL caused the Decedent to develop the debilitating brain diseases and conditions set forth above, which diseases and conditions caused extreme pain, suffering, and anguish and, ultimately, death.

342    The legal representative of the decedent claims damages recoverable under applicable law for all pecuniary losses suffered by the deceased by reason of his death.

343    As a direct and proximate result of the untimely death of the decedent his respective survivors and/or surviving distributees have been deprived of the earnings, maintenance, guidance, support and comfort that they would have received from for the rest of the respective decedent's natural life, and have suffered commensurate pecuniary losses because of the decedent's wrongful death.

344    The decedent's legal representatives claim the full measure of damages allowed under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff TRICOU BRABHAM, Individually and as personal representative of the Estate of DANIEL E. BRABHAM, deceased, prays for judgment as follows:

A.    With respect to Count I, granting Declaratory relief requested pursuant to C.P.L.R. 3001 against the NFL;

B.    With respect to Counts II through VII, IX and X, granting an award of compensatory and punitive damages against the NFL.

-69-

C.      With respect to Count VIII, granting an award of compensatory and punitive damages against all Defendants.

D.      With respect to all counts, awarding Tricou Brabham as personal representative of the Estate of Daniel E. Brabham, deceased and in her own right such other and further relief as may be appropriate; and

E.      Granting an award to Plaintiff Tricou Brabham as personal representative of the Estate of Daniel E. Brabham, deceased and in her own right of prejudgment interest, costs and attorneys fees.

## JURY DEMANDED

Plaintiff Tricou Brabham as personal representative of the Estate of Daniel E. Brabham, deceased and in her own right hereby demands a trial by jury on all matters so triable.

Dated:  New York, New York
        November 14, 2012

Respectfully Submitted,

LOCKS LAW FIRM PLLC

BY:

Gene Locks, Esq.
Marc P. Weingarten, Esq.
Andrew P. Bell, Esq.
747 Third Avenue, 37th Floor
New York, NY 10017
abell@lockslaw.com

*Counsel for Plaintiff*

## ATTORNEY'S VERIFICATION

The undersigned, an attorney admitted to practice in the Courts of the State of New York, shows that:

Affirmant is a partner with the attorneys of record for plaintiffs in the within action; affirmant has read the foregoing SUMMONS AND VERIFIED COMPLAINT and knows the contents thereof to be true to affirmant's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that as to those matters, affirmant believes those matters to be true.

The grounds of affirmant's belief as to all matters not stated upon his knowledge are based upon information contained in the file maintained in affirmant's office.

This verification is made by affirmant and not by the plaintiff because the plaintiff resides outside the county wherein affirmant maintains his office.

The undersigned affirms that the foregoing statements are true, under the penalties of perjury.

Dated: New York, New York
      November 14, 2012

ANDREW P. BELL, ESQ.



# NYSCEF - New York County Supreme Court
# Confirmation Notice

This is an automated response for Supreme Court / Court of Claims cases. The NYSCEF site has received your electronically filed document(s) for:

**Tricou Brabham - v. - The National Football League et al**

**158011/2012**

## Documents Received

| Doc # | Document Type | Motion # | Date Received |
|-------|---------------|----------|---------------|
| 2 | STIPULATION | | 12/06/2012 03:54 PM |

## Filing User

| | | | |
|---|---|---|---|
| Name: | **BRAD S KARP** | | |
| Phone | **212-373-3316** | E-mail Address: | **bkarp@paulweiss.com** |
| Fax #: | | Work Address: | **1285 Avenue of the Americas New York, NY 10019** |

## E-mail Notifications

An e-mail notification regarding this filing has been sent to the following address(es) on 12/06/2012 03:54 PM :

**BELL, ANDREW P - abell@lockslaw.com**

**KARP, BRAD S - bkarp@paulweiss.com**

**NOTE: If submitting a working copy of this filing to the court, you must include as a notification page firmly affixed thereto a copy of this Confirmation Notice.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

TRICOU BRABHAM,
Individually and as Personal Representative of the
Estate of DANIEL E. BRABHAM,

                    Plaintiff,

                - against -

THE NATIONAL FOOTBALL LEAGUE, NFL
PROPERTIES, LLC,

                    Defendants.

---

Index No. 158011/2012

**STIPULATION FOR EXTENSION
OF TIME TO ANSWER, MOVE,
OR OTHERWISE RESPOND
TO THE COMPLAINT**

---

1.    WHEREAS plaintiff Tricou Brabham, individually and as personal

representative of the Estate of Daniel E. Brabham ("Brabham") served defendants

National Football League and NFL Properties LLC ("NFL Defendants") in this action on

November 20, 2012;

2.    WHEREAS the Stipulation For Extension of Time to Answer,

Move, or Otherwise Respond to the Complaint is without waiver of the NFL Defendants'

ability to remove the action to the United States District Court for the Southern District of

New York pursuant to 28 U.S.C. §§ 1367, 1441 and 1446, or to move to dismiss the

Complaint, on any grounds;

       IT IS HEREBY STIPULATED AND AGREED, by and between the

parties hereto through their undersigned counsel that the time for the NFL Defendants to

answer, move, or otherwise respond to the complaint in this action is extended to and

including December 20, 2012.

2

IT IS FURTHER STIPULATED AND AGREED that this Stipulation For

Extension of Time to Answer, Move, or Otherwise Respond to the Complaint may be

filed with signatures in counterparts and/or with facsimile signatures serving as originals.

Dated:  New York, New York
        December 5, 2012

Respectfully submitted,

Brad S. Karp
Theodore V. Wells, Jr.
Beth A. Wilkinson
Lynn B. Bayard

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
*bkarp@paulweiss.com*
(212) 373-3000

*Attorneys for NFL Defendants*

Gene Locks, Esq.
Marc P. Weingarten, Esq.
Andrew P. Bell, Esq.

LOCKS LAW FIRM PLLC
747 Third Ave., 37th Floor
New York, NY 10017
(212) 838-3333

*Attorneys for Plaintiff*